UNITED STATES of America, Appellee,

v.

**Lloyd M. PELTON, Appellant.**

UNITED STATES of America, Appellee,

v.

**Jacqueline RICH, Appellant.**

**Nos. 77–1682, 77–1695.**

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 9, 1978.

Decided June 7, 1978.

Rehearing and Rehearing En Banc Denied in No. 77–1695 July 3 and in No. 77-1682 July 24, 1978.

Claude Hanks, Clayton, Mo., Hanks Taylor & Suddarth, Clayton, Mo., filed brief, for appellant, Pelton.

Irl B. Baris, St. Louis, Mo., for appellant, Rich.

David M. Rosen, Asst. U. S. Atty., argued, Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief, for appellee.

Before GIBSON, Chief Judge, and ROSS and WEBSTER,[1] Circuit Judges.

GIBSON, Chief Judge.

This case involves charged violations of the Mann Act arising out of certain interstate activities undertaken by a prostitution operation based in St. Louis, Missouri. In July 1977, the Government returned an eight-count indictment against Jacqueline "Pat" Rich, Lloyd Pelton and Ann Frazier.[2]

---

1. Prior to leaving this court to become Director of the Federal Bureau of Investigation, Judge Webster heard oral argument in this case, participated in the conference thereon, and concurred in the result.

2. Count I charged Rich and Frazier with conspiracy to knowingly transport women in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2421. The overt acts offered in support of this conspiracy charge

The first four counts of the indictment related to travel by prostitutes between St. Louis, Missouri, and Chicago, Illinois; the second four counts related to travel between St. Louis, Missouri, and Winnemucca, Nevada.

In late September 1976, Fred Coughlin, then a sales representative for a boat company in the St. Louis area, asked Rich to provide prostitutes for a forthcoming boat show in Chicago. Rich agreed to let Coughlin take two call girls whom she employed to Chicago to "work" the boat show. She then directed Kathleen Bray and Charlotte Anderson to drive to Chicago with Coughlin. She also arranged for the separate transportation to Chicago of Kathleen Waggoner, another call girl in her employ. All three women travelled to Chicago as arranged by Rich and worked as prostitutes at a boat show; while in Chicago they were managed pursuant to arrangements made by Rich. Bray became ill and returned to St. Louis earlier than the others, who returned at the conclusion of the boat show.

Upon Bray's return to St. Louis, plans were made for sending her and another call girl known as Georgia to work at Penny's Cozy Corner, a house of prostitution in Winnemucca, Nevada. According to Bray, she was present at Rich's apartment when Rich and Pelton made arrangements for this trip. Pelton called an acquaintance of his at Penny's Cozy Corner and arranged for Bray's stay there. It was agreed that he would receive $200 per girl for his placement services. Rich gave Bray $200 to buy clothes and $250 to buy an airplane ticket to Nevada and to pay for a doctor's examination and the accessories that she would need at Penny's Cozy Corner. Rich was to receive a percentage of the money which Bray earned in Nevada. Bray flew to Nevada and attempted to become licensed as a prostitute. Her application for a license was denied because she was under the age of eighteen, and she returned to St. Louis. Following Bray's return, Pelton and Rich made plans and arrangements, similar to those which they had made for her Nevada trip, for sending Shirley Dawson and Charlotte Anderson to Winnemucca. Pursuant to these arrangements, Dawson and Anderson travelled to Winnemucca in October 1976, and began to work at Penny's Cozy Corner. They quickly discovered that employment in Nevada was not as lucrative as they had imagined it would be and they returned to St. Louis after only a short tenure in Winnemucca.

Rich and Pelton were tried jointly to a jury on the charges arising from the aforesaid events.[3] Rich, who was charged in all eight counts, was found guilty on Counts I–VII and acquitted on Count VIII (Nevada trip of Anderson). She received an aggregate sentence of ten years' imprisonment.[4]

were alleged to have occurred on September 29 and 30, 1976, in connection with the transportation of three call girls to Chicago to "work" a boat show. Three of the overt acts alleged in Count I formed the basis of the substantive violations of 18 U.S.C. § 2421 with which Rich alone was charged in Counts II, III and IV. Count II charged Rich with a § 2421 violation with regard to Kathleen Waggoner, a/k/a "Monica"; Count III charged her with a similar violation with regard to Kathleen Bray, a/k/a "Baby"; and Count IV related to the interstate transportation of Charlotte Anderson, a/k/a "Frosty," in violation of § 2421.

Count V charged Rich and Pelton with conspiracy to knowingly transport women in interstate commerce for purposes of prostitution in violation of 18 U.S.C. § 2421. The overt acts offered in support of this conspiracy charge related to the transportation of three women,

Shirley Dawson, Kathleen Bray and Charlotte Anderson, to Winnemucca, Nevada, for purposes of prostitution. Count VI charged Rich and Pelton with violating 18 U.S.C. § 2422 by persuading, inducing and enticing Shirley Dawson to go to Winnemucca to act as a prostitute and by causing her to be transported there as a passenger upon the line and route of a common carrier in interstate commerce. Counts VII and VIII charged Rich and Pelton with similar violations with regard to Kathleen Bray and Charlotte Anderson, respectively.

**3.** Frazier indicated a willingness to dispose of her case in Chicago under the provisions of Fed.R.Crim.P. 20; she was not tried with Rich and Pelton.

**4.** Rich was sentenced to a five-year term of imprisonment on each of her seven convictions.

Pelton, who was charged only in Counts V–VIII, was found guilty on Counts V (conspiracy involving trips to Nevada) and VII (Nevada trip of Bray) and acquitted on Counts VI and VIII (Nevada trips of Dawson and Anderson respectively). He received two concurrent sentences of three years' imprisonment.

Both defendants appeal. We first consider appellant Rich's contentions.

## Continuance

Rich was arrested on July 11, 1977, and arraigned on July 18. At her arraignment, the District Court[5] set an August 1 trial date, despite protestations by Rich's counsel that this date would be inconvenient to him. On July 27, Pelton, who had also been given an August 1 trial date when he was arraigned on July 11, filed a motion for a continuance and the Government filed a written response requesting a denial of the motion. On July 28, Rich moved for a continuance.

When the case was called for trial on the morning of August 1, the District Court considered defendants' continuance motions. In support of their motions, both counsel asserted personal exigencies that had curtailed their pretrial preparation. Government counsel expressed opposition to the granting of a continuance, primarily because of his fear that delay of the trial could lead to the unavailability of several important Government witnesses who were then in protective custody. The District Court denied defendants' continuance motions, and on the afternoon of August 1, voir dire examination of potential jurors was conducted, a jury was impanelled and trial was commenced. Rich contends that the trial court's refusal to grant a continuance was erroneous because it precluded her attorney from making adequate preparation and investigation for her defense.

We note initially that a review of the trial transcript shows that Rich was vigorously defended at trial and belies the suggestion that counsel had less than adequate time to prepare for trial. The twenty-day period from time of arrest to trial appears adequate, particularly in view of the strictures of the Speedy Trial Act. Moreover, a motion for continuance is addressed to the sound discretion of the trial court, and a refusal to grant a continuance will be set aside only upon a showing of a clear abuse of discretion. *United States v. Jackson*, 549 F.2d 517, 528 (8th Cir.), *cert. denied*, 430 U.S. 985, 97 S.Ct. 1682, 52 L.Ed.2d 379 (1977); *United States v. Webb*, 533 F.2d 391, 395 (8th Cir. 1976). Counsel for Rich supported his motion for continuance with the speculation that there might be witnesses in Chicago and Nevada whom he had been unable to interview prior to trial because of the personal time strictures of his life. In opposing a continuance, the Government presented specific and cogent reasons which went to the very viability of the prosecution. On these facts, we are unable to say that the trial court abused its discretion in refusing to grant a continuance.

## Discovery of tape recordings in the Government's possession

Discovery of evidence in criminal cases is governed by the provisions of Rule 16 of the Federal Rules of Criminal Procedure. Prior to trial, Rich made a request under Rule 16 for tape recordings of her voice which were in the Government's possession. Ordinarily, when a defendant requests inspection of his or her statements which are in the possession, custody or control of the Government, the Government has a duty of disclosure under Rule 16(a)(1)(A).[6] In the instant case, the

---

She received concurrent terms of imprisonment on Counts I–IV. Her sentences on Counts V–VII run concurrently with one another, but consecutively to the sentences in Counts I–IV.

**5.** The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri.

**6.** Rule 16(a)(1)(A) provides in pertinent part: Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or copies thereof, within the possession, custody or control of the government * * *.

Government declined to disclose to Rich the tape recordings of her voice which were in its possession. Motivated by concern for the safety of persons cooperating on the case, whose identity would be revealed to Rich if she heard the tapes, the Government requested a protective order under Rule 16(d)(1), which provides:

> Upon a sufficient showing the court may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate. Upon motion by a party, the court may permit the party to make such showing, in whole or in part, in the form of a written statement to be inspected by the judge alone. If the court enters an order granting relief following such an ex parte showing, the entire text of the party's statement shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

In support of its request, the Government made an ex parte presentation to the court. Upon listening to the tapes, the trial judge concluded that they contained nothing exculpatory of Rich. He then made the tapes a part of the record and issued a Rule 16(d)(1) order sealing them. The tapes were not used at trial. The Government also assures us that it made no use at trial of any evidence derived from the tapes.

██ Rich contends, nonetheless, that the court erred in denying her access to the recordings of her voice. Discovery matters are committed to the sound discretion of the district court and an error in administering the discovery rules is reversible only on a showing that the error was prejudicial to the substantial rights of the defendant. *United States v. Crow Dog*, 532 F.2d 1182, 1189 (8th Cir. 1976), *cert. denied*, 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977); *United States v. Cole*, 453 F.2d 902, 904–05 (8th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972). Given the trial court's finding that the tapes contained no

exculpatory evidence and the fact that the Government made no direct or derivative use of the tapes, we find it difficult to understand how Rich could have been prejudiced by being denied access to the tapes. Moreover, a review of the record reveals that the protective order at issue here was entered in conformance with Rule 16(d)(1), which specifically authorizes ex parte proceedings. The purpose of the order sought here was to protect the identity of persons cooperating on the case. An adversary proceeding would have defeated the very purpose of the requested order by revealing their identities to Rich.

██ A review of the record, which includes the sealed tapes at issue here, convinces us that an ex parte proceeding was appropriate on the facts of this case and that the Government made a sufficient showing for a protective order under Rule 16(d)(1). The District Court acted well within its discretion and in full compliance with Rule 16(d)(1) in denying Rich access to the tapes in the Government's possession. Furthermore, Rich has made no showing that this order prejudiced her substantial rights. Her contention regarding the Rule 16(d)(1) order is without merit.

### Pretrial discovery of Government witnesses

Prior to trial, defendant Rich moved to compel the Government "to make witnesses and statements" available. Etta Williams, a/k/a "Agnes Brittain," an unindicted co-conspirator in Count I, was the only prospective Government witness identified in the motion. The District Court denied the motion and refused to order pretrial discovery of the Government's witnesses.[7] Rich contends that the trial court erred in refusing to order pretrial discovery of the Government's witnesses. She also suggests that the Government interfered with her investigation of the case by concealing prospective witnesses from her.

---

7. In denying defendants' motion for pretrial discovery of witnesses, the district judge made it clear that his ruling had no bearing whatsoever on the Government's duty under 18 U.S.C. § 3500 to provide defendants with statements of witnesses after they had testified on direct examination at trial. It is clear that the Government complied fully with § 3500.

 Rich's attack on the District Court's refusal to order pretrial discovery of witnesses is wholly lacking in merit. Discovery of prospective witnesses is not required under Fed.R.Crim.P. 16(a), *United States v. Krohn*, 558 F.2d 390, 394 (8th Cir.), *cert. denied*, 434 U.S. 868, 98 S.Ct. 207, 54 L.Ed.2d 145 (1977); *United States v. Rogers*, 549 F.2d 490, 494 (8th Cir. 1976), *cert. denied*, 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977), and we can find no abuse of discretion in the trial court's refusal to order this pretrial discovery. Moreover, there is no support in the record for the suggestion that the Government impeded Rich in the investigation of her case by denying her access to prospective witnesses Charlotte Anderson, Ann Frazier, Kathleen Waggoner and Etta Williams.

 Rich employed Charlotte Anderson as a call girl. She makes no allegation whatsoever of contact between Anderson and the Government prior to trial. The Government denies having interviewed Anderson or even having known where she could be found; it did not call Anderson as a witness. Clearly there is no support for an inference of governmental concealment of Anderson. During the period in question, Ann Frazier and Kathleen Waggoner, neither of whom was called as a witness by the Government at Rich's trial, had been charged with crimes by the Government. Rich presents this sole fact as the basis for her charge of concealment by the Government. The facts of this case simply do not support an equation of indictment with concealment and we decline to infer such an equation.

 Etta Williams was the Government's initial source of information in this case. Shortly after her involvement in the investigation of the case began, her apartment was firebombed. This event, plus another incident which suggested that her safety was in continuing jeopardy, resulted in her being placed in the protective custody of the Government and being given a new identity. Understandably, she did not wish to speak to defendants prior to trial. Rich has not shown that this reluctance on Williams' part was anything other than a matter of her own personal choice. The fact that the Government had undertaken to protect her does not transform this choice into governmental concealment. Moreover, Rich's claim of prejudice because of her inability to interview Williams prior to trial is undercut by events which transpired during trial. Williams was present on the trial dates and was made available to the defendants after the Government determined that it would not use her as a witness. Defendants interviewed Williams at that time and decided not to call her as a witness. We conclude that Rich has failed to establish that the Government precluded her from interviewing a witness willing to talk with her prior to trial or that her lack of pretrial contact with Williams was prejudicial to her defense.

*Grand jury testimony of Kathleen Waggoner*

Count II of the indictment underlying the instant case charged Rich with a § 2421 violation with regard to the transportation of Kathleen Waggoner to Chicago. Waggoner's trip to Chicago was also one of the overt acts alleged in support of the conspiracy charged in Count I. On June 1, 1977, pursuant to a grant of use immunity, Waggoner testified before a grand jury investigating possible violations by Rich of 18 U.S.C. §§ 1503, 1952 and 2421. During her appearance before the grand jury, Waggoner denied that Rich had sent her to Chicago in 1976 to work as a prostitute at the boat show and also denied that Rich had ever set her up on prostitution dates. As a consequence of this testimony, Waggoner was indicted on two counts of perjury before the grand jury in violation of 18 U.S.C. § 1623. This indictment, which was handed down on June 25, 1977, set forth verbatim those portions of the grand jury transcript in which Waggoner denied that Rich had sent her to Chicago or set her up on prostitution dates. Waggoner was convicted on both counts of perjury at a trial which took place after the trial of Rich and Pelton.

In a pretrial motion, Rich sought "the testimony of all witnesses before any grand jury which investigated this matter which is favorable to this defendant." In its answer to Rich's motion, the Government stated that it would provide grand jury transcripts only insofar as it was required to do so by 18 U.S.C. § 3500. The trial court sustained the Government's position and denied Rich's motion. This ruling was consonant with the well-established rule in this circuit that grand jury testimony is generally not discoverable on pretrial motion. *United States v. Harflinger*, 436 F.2d 928, 935 (8th Cir. 1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971).

Waggoner was not called as a witness at Rich's trial. If the Government had called Waggoner and if she had testified, Rich would have been entitled to a transcript of her grand jury testimony under 18 U.S.C. § 3500. Rich herself did not attempt to call Waggoner as a witness. Rather, she assumed that Waggoner would refuse to testify and sought, on that basis, to introduce a transcript of Waggoner's grand jury testimony into evidence.

On the morning of the third day of trial, counsel for Rich made the following in-chambers presentation to the trial court:

> I have caused a subpoena to be served upon Kathleen Waggoner to testify. It is my understanding that she is under charges at the present time in this Court or in another Division and her attorney has indicated that he will advise her to invoke her privilege under the Fifth Amendment and refuse to testify. On that basis, Your Honor, I would request an opportunity to utilize her Grand Jury testimony and introduce portions of the Grand Jury testimony which would be relevant and request that the Government furnish me with a copy of her Grand Jury testimony. I believe that it would be admissible pursuant to Rule 804 of the Federal Rules of Evidence.

The Government objected to the use of Waggoner's grand jury testimony. The court and both parties then discussed the general nature of Waggoner's testimony before the grand jury, the use immunity under which she had testified and the perjury indictment then pending against her. The district judge ultimately refused to allow Rich to introduce the transcript of Waggoner's grand jury testimony into evidence. Contemporaneously, however, he ruled that Rich could read Waggoner's indictment to the jury. Although this indictment contained testimony in which Waggoner denied that Rich had sent her to Chicago or had set her up on prostitution dates, counsel for Rich chose not to introduce it into evidence.

Rich now contends that Waggoner's grand jury testimony was admissible under Fed.R.Evid. 804(a)(1) and that the trial court erred in refusing to allow her to introduce the relevant portions of this transcript at trial. Rule 804 sets forth those instances in which the hearsay statements of unavailable declarants may be admitted into evidence at trial. Rich relies upon § (a)(1) of Rule 804, which provides that a declarant is "unavailable" if he or she "is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of his statement."

The unavailability requirement of Rule 804 places the burden of producing an unavailable declarant upon the proponent of the evidence. *United States v. Amaya*, 533 F.2d 188, 191 (5th Cir. 1976), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1125, 51 L.Ed.2d 551 (1977); *see generally* 11 Moore's Federal Practice ¶ 804.02, at VIII–239–40 (2d ed. 1976). Rich, the proponent here, accordingly had the burden of establishing that Waggoner would invoke her fifth amendment privilege and thus be unavailable to testify. Our review of the record convinces us that Rich utterly failed to carry this burden. Counsel for Rich made no effort to produce Waggoner, whom he had subpoenaed, and to demonstrate first-hand and in the court's presence that she did intend to refuse to testify in reliance on her fifth amendment privilege against self-incrimination. Rather, he chose to raise the issue of her privilege in an extenuated and circuitous manner which gave the court

nothing more than a speculative basis for determining whether she was available. Rich's proof that Waggoner was unavailable under Rule 804(a)(1) was that Waggoner's attorney had said that he was going to advise Waggoner not to testify. There was no indication that Waggoner had in fact been so advised or that, if she had been, she had decided to exercise her privilege. We consider Rich's suggestion, that Waggoner might in the future be advised of and then choose to exercise her fifth amendment privilege, to be a wholly inadequate showing of unavailability under Rule 804(a)(1). The trial court did not err in refusing, on this speculative basis, to allow Rich to introduce into evidence the transcript of Waggoner's testimony before the grand jury.[8]

### Sufficiency of the evidence

 Rich contends that the evidence was insufficient to support her convictions. In considering this contention, we must view the evidence in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942). We have done so and we conclude that the evidence against Rich is legally sufficient to support her convictions. Indeed, the plethora of evidence of Rich's participation in the transportation of women to Chicago and Nevada is such that we cannot find a close question of evidentiary sufficiency on any of the seven counts on which she was convicted. Under these circumstances we choose not to catalogue the evidence adduced against Rich. Suffice it to say that the evidence, when viewed in the light most favorable to the Government, is more than sufficient to support the jury's verdicts of guilty on Counts I–VII.

We will now address defendant Pelton's contentions.

### Constitutionality of 18 U.S.C. § 2421

 Pelton argues that since prostitution is legal in Winnemucca, Nevada, the destination of the female whose interstate transportation underlies his convictions, the Mann Act unconstitutionally violates and derogates "the rights of females to seek legal employment as guaranteed by the constitution of this country." As we have previously noted, "[i]t is rather late in the history of the Mann Act to still be contending for its unconstitutionality. The Act has been consistently upheld * * *." (Citations omitted.) *United States v. Garrett*, 521 F.2d 444, 446 (8th Cir. 1975). Defendant Pelton is not a female whose ability to seek legal employment was constrained by the Mann Act and he consequently lacks standing to attack the statute on this basis. *See United States v. Garrett, supra* at 446. Because of his lack of standing, we pretermit analysis of the substance of his constitutional challenge, although we cannot help but note that its strength appears to lie in its ingenuity rather than in any degree of legal cogency. It is difficult to conceive of prostitution as being constitutionally guaranteed and protected.

8. Rich also argues that the Government breached its duty of disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to release Waggoner's grand jury testimony. Under *Brady*, governmental suppression at trial of "evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland, supra* at 87, 83 S.Ct. at 1196. We can find no due process infringement in the instant case. Unlike *Brady*, where the evidence suppressed by the prosecution did not come to the defendant's notice until after he had been tried, convicted and sentenced and his conviction had been affirmed, defendant Rich clearly had notice prior to trial of the evidence at issue here and in fact had access to the crucial aspects of Waggoner's grand jury testimony through the Waggoner indictment. She chose not to introduce the indictment with this verbatim testimony into evidence. We would ordinarily be hesitant to construe a tactical decision of this nature as an indicator of the materiality of evidence. Rich's subsequent treatment of Waggoner's grand jury testimony, however, supports the initial impression that its worth to Rich's defense was nugatory. Although Rich has had access to Waggoner's grand jury testimony since Waggoner's trial, when it became a matter of public record, she has failed to specify any favorable evidence therein which she did not already have access to by way of Waggoner's indictment. On these facts, we reject Rich's claim that non-access at trial to Waggoner's grand jury testimony constituted a violation of her right to due process.

## Severance

 Pelton filed a pretrial motion for severance which was denied by the District Court on July 27. At a pretrial proceeding on the morning of August 1, counsel for Pelton brought the severance issue back to the District Court's attention in a somewhat roundabout way, expressing the opinion that Pelton could not receive a fair trial because most of the evidence in the case was unrelated to Pelton. He made no formal motion for a severance at this time, however. Moreover, it is undisputed that Pelton did not renew the motion for severance at the close of the Government's evidence or at the conclusion of all the evidence. If not so renewed, the motion is "deemed waived." *United States v. Porter*, 441 F.2d 1204, 1212 (8th Cir.), cert. denied, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). Accordingly, we hold that Pelton has waived his right to assert the severance issue.

## Sufficiency of the evidence

Pelton was charged in only those four counts of the indictment related to the Nevada trips. He was acquitted on Counts VI and VIII, which charged him with inducing the transportation to Nevada of Shirley Dawson and Charlotte Anderson. He was convicted on Count V, the conspiracy charge stemming from the Nevada trips, and on Count VII, the charge involving the inducement of Kathleen Bray to travel to Nevada. Pelton contends that his convictions on Counts VI and VII are not supported by sufficient evidence.

 In analyzing this contention, our point of departure must be those well-worn principles which require us to view the evidence in the light most favorable to the Government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and to accept as established all reasonable inferences from the evidence that tend to support the jury's verdict. *United States v. Overshon*, 494 F.2d 894, 896 (8th Cir.), cert. denied, 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974). We must, moreover, be guided by the general rule that "it is not necessary that the evidence exclude every reasonable hypothesis except that of guilt but simply that it be sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane*, 517 F.2d 1173, 1177 (8th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975). This standard also applies in cases where the conviction rests on circumstantial evidence, *see United States v. Joyner*, 539 F.2d 1162, 1165 (8th Cir.), cert. denied, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976); *United States v. Shahane, supra* at 1177, since circumstantial evidence is intrinsically as probative as direct evidence. *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 731 (1954). With these familiar principles in mind, we address Pelton's attack upon the sufficiency of the evidence supporting his convictions.

## Count V

Count V charged Pelton and Rich with a conspiracy to "knowingly transport in interstate commerce a woman or girl for the purpose of prostitution or debauchery and other immoral purposes [a violation of Title 18, U.S.C. § 2421]." The indictment posited that in furtherance of this conspiracy Rich and Pelton agreed to send women and girls from St. Louis, Missouri, to Winnemucca, Nevada, for purposes of prostitution on various dates in October 1976, and that Rich gave Shirley Dawson, Kathleen Bray and Charlotte Anderson money to purchase tickets to Reno, Nevada.

Pelton contends generally that the evidence supporting his conspiracy conviction does not prove the existence of an unlawful agreement between him and Rich. More specifically, he argues that any agreement that may have existed was lawful because prostitution is legal in Nevada and/or because the women in question travelled to Nevada on their own volition.

 "The offense of conspiracy consists of an agreement between the conspirators to commit an offense, attended by an act of one or more of the conspirators to effect the object of the conspiracy." *Unit-*

*ed States v. Skillman*, 442 F.2d 542, 547 (8th Cir.), *cert. denied*, 404 U.S. 833, 92 S.Ct. 82, 30 L.Ed.2d 63 (1971). The agreement need not be express or formal and it may be established by circumstantial evidence. *United States v. Hutchinson*, 488 F.2d 484, 490 (9th Cir. 1973), *cert. denied*, 417 U.S. 915, 94 S.Ct. 2616, 41 L.Ed.2d 219 (1974). Indeed, this court has long recognized that since conspiracy is rarely susceptible of proof by direct evidence, it may properly be adduced from the conduct of the parties and the attending circumstances. *Rizzo v. United States*, 304 F.2d 810, 825 (8th Cir.), *cert. denied*, 371 U.S. 890, 83 S.Ct. 188, 9 L.Ed.2d 123 (1962); *Goode v. United States*, 58 F.2d 105, 107 (8th Cir. 1932).

The conduct of the parties and the attending circumstances revealed by the record here support the existence of an agreement by Rich and Pelton to transport women to Nevada for prostitution purposes. Bray, one of the women so transported, testified that she was present at Rich's apartment in St. Louis when Rich and Pelton decided to send her and another call girl named Georgia to Penny's Cozy Corner, a house of prostitution in Winnemucca, Nevada. In Bray's presence, Pelton made a telephone call to Penny's and arranged for her to work there. Pelton and Rich then gave Bray instructions on what to do when she reached Winnemucca. She was told to register as a prostitute, which would require lying about her age since she was not yet eighteen years old, to get a doctor's examination and then to go to Penny's. Bray, Rich and Pelton agreed that Bray would give 40% of her earnings to Penny's and split the remaining 60% with Rich. Bray also agreed to pay Pelton $200 for setting her up at Penny's. To finance the trip, Rich lent Bray $200 for clothes and $250 for airfare, a license and the accessories which would be necessary at Penny's. Bray subsequently flew from St. Louis to Nevada in accordance with the plans and arrangements formulated by Rich and Pelton and attempted to become a prostitute. Upon being denied a license in Winnemucca because she was under age, she returned to St. Louis. We believe that the evidence in this case was sufficient to have convinced the jury beyond a reasonable doubt that Pelton was guilty of participating in a conspiracy with Rich knowingly to transport a woman to Nevada in interstate commerce for purposes of prostitution.

We must reject as unavailing Pelton's attempt to legitimize his agreement with Rich by arguing that prostitution is legal in Nevada and that Bray had a desire to travel to Nevada and to work there as a prostitute which pre-existed his participation in the plans. Section 2421 flatly prohibits transportation of women in interstate commerce "for the purpose of prostitution or debauchery, or for any other immoral purposes"; its prohibition is not keyed to the legality or illegality of prostitution under the law of the state where the transportation ends. When Rich and Pelton agreed to send Bray to Nevada to work as a prostitute, they made an agreement to violate § 2421, and the status of prostitution under Nevada law has no bearing on the illegality of this agreement under the Mann Act.

Equally lacking in legal merit is Pelton's suggestion that any agreement he may have had with Rich was legal because Bray was predisposed and willing to go to Nevada to work as a prostitute. Whether or not Bray was so predisposed and willing is immaterial to the illegality of Pelton's agreement with Rich to violate § 2421, for consent is neither a defense to a violation charged under § 2421, *Gebardi v. United States*, 287 U.S. 112, 119, 53 S.Ct. 35, 77 L.Ed. 206 (1932); *Hattaway v. United States*, 399 F.2d 431, 433 (5th Cir. 1968); *Wiley v. United States*, 257 F.2d 900, 905 (8th Cir. 1958), nor to a violation charged under § 2422. *Blumenfield v. United States*, 284 F.2d 46, 53 (8th Cir.), *cert. denied*, 365 U.S. 812, 81 S.Ct. 693, 5 L.Ed.2d 692 (1960). Pelton conspired with Rich to transport Bray in interstate commerce to Nevada for purposes of prostitution in violation of § 2421. Whatever Bray's degree of willingness to travel may have been, it does not vitiate the illegality of the agree-

ment to transport her for purposes of prostitution.

## Count VII

Count VII charged Pelton and Rich with violating 18 U.S.C. § 2422 by persuading, inducing and enticing Kathleen Bray to go in interstate commerce to Nevada with the intent on their part that she engage in prostitution there, and with thereby knowingly causing her to be transported there as a passenger upon the line and route of a common carrier in interstate commerce. In challenging the sufficiency of the evidence supporting his conviction on this count, Pelton does not dispute that Bray was transported to Nevada for purposes of prostitution. His attack on the sufficiency of the evidence pertains to the issue of inducement. He seems to contend that because there was evidence that Bray was willing to go to Nevada to work as a prostitute, the record will not support a finding of inducement on his part.

We are unable to agree. Even if we assume that Bray was willing to travel to Nevada to be a prostitute, the fact remains that by setting her up at Penny's Cozy Corner, Pelton helped provide the inducement which caused her to make the trip.[9] It is the inducement of transportation which is prohibited under § 2422, not the actual provision of that transportation. *Nunnally v. United States*, 291 F.2d 205, 206–07 (5th Cir. 1961). When an offer to travel interstate for purposes of prostitution elicits a positive response from a woman to whom it is made, it constitutes a requisite inducement under the statute. *Harms v. United States*, 272 F.2d 478, 481 (4th Cir. 1959), *cert. denied*, 361 U.S. 961, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). The evidence here shows that Pelton made an inducement sufficient to persuade Bray to travel to Nevada. We believe that Pelton's conviction under § 2422 with regard to Bray's inducement is supported by sufficient evidence.

Affirmed.

9. Indeed, the fact that until Pelton "placed" her at Penny's, Bray may have harbored an unfulfilled wish to go to Nevada to be a prostitute emphasizes rather than undercuts the causal relationship between Pelton's inducement and Bray's trip.