**UNITED STATES of America, Appellee,**

v.

**Robert R. HUTCHINGS, Appellant.**

**No. 84–1059.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 19, 1984.

Decided Dec. 26, 1984.

Rehearing and Rehearing En Banc Denied
Jan. 28, 1985.

McMillian, Circuit Judge, filed specially concurring opinion.

Charles Alan Seigel, St. Louis, Mo., for appellant.

Pamela H. Bucy, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before McMILLIAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and ARNOLD, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Robert R. Hutchings appeals from his conviction on five counts of mail fraud, six counts of wire fraud, and three counts of transporting checks in interstate commerce, knowing them to have been taken by fraud. The district court[1] sentenced him to fifteen years imprisonment, followed by five years probation. The charges stemmed from Hutchings' alleged scheme to defraud CUPAC, an insurance premium finance company. Having considered Hutchings' many allegations of error, we find none to be of merit and affirm the conviction.

## I. Background

From 1975 until 1983, Hutchings was president of United States Central Underwriting Agency (U.S.C.), an insurance agency. In addition Hutchings owned three corporations: Anmat Corporation (Anmat), Meramec Investment Corporation (Meramec), and RJE Enterprises (RJE). The evidence at trial established that Hutchings arranged to obtain insurance policies on Anmat, Meramec, and RJE from North-West Insurance Company (North-West), through its wholly owned subsidiary, Mid-Continent. Hutchings directed Clark Stagner, an employee of U.S.C., to contact several insurance premium finance companies to compare quotations as to financing terms on the policies.

Deciding to finance the policies through CUPAC, a Massachusetts premium finance company, Hutchings assigned Stagner to handle the transactions. Specifically, Hutchings instructed Stagner to tell CUPAC that the policies were to be obtained through North-West at the following premiums: Anmat, $60,000.00; Meramec, $547,000.00; and RJE, $305,000.00. These amounts, Hutchings advised Stagner, included large "fees" which U.S.C. would receive to use as "working capital;" the premiums were inflated ten to one-hundred times the actual amounts charged by the insurance companies.[2] In addition, Hutchings told Stagner to state in the finance agreements that Anmat, Meramec, and RJE had made significant down payments on the policies to U.S.C. as their insurance agent, when in fact no such down payments were made. A representative from CUPAC testified that had CUPAC known the amounts represented as premiums actually included fees, and that no down payments had been made, the company would not have financed the premiums.

According to the standard practice, CUPAC sent checks for the amounts financed (a total of $787,985.00) to U.S.C., as agent for Anmat, Meramec, and RJE, with the understanding that U.S.C. would forward to North-West this amount as well as the alleged down payment. As is true in all premium financing arrangements, Anmat, Meramec, and RJE had assigned to CUPAC as collateral the right to cancel the policies and collect the unearned premium refund from the insurance company, in the event of default. When Anmat, Meramec, and RJE missed their repayment to CUPAC, CUPAC tried to exercise its power to cancel the policies and collect the premium refund from North-West, and discovered that the policies had been cancelled without North-West ever receiving any money from U.S.C., except $4,252.50.

Hutchings was indicted and tried on five counts alleging mail fraud in violation of 18 U.S.C. § 1341,[3] six counts alleging wire

---

**1.** The Honorable James H. Meredith, United States Senior District Judge, Eastern District of Missouri.

**2.** Hutchings directed Stagner to tell CUPAC the premiums on the Anmat, Meramec, and RJE policies were $60,000.00, $547,000.00, and $305,-000.00, respectively. In fact, however, the true premiums were as follows: Anmat, $6,388.00; Meramec $4,140.00; and RJE $4,359.00. All North-West ever received on $912,000.00 of al-

leged premiums financed by CUPAC was $4,252.50.

**3.** 18 U.S.C. § 1341 (1982) states in part:

"Whoever, having devised * * * any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises * * *, for the purpose of executing such scheme or artifice * * *, places in any post office or authorized

fraud in violation of 18 U.S.C. § 1343,[4] and three counts of transporting checks in interstate commerce, knowing them to have been taken by fraud, in violation of 18 U.S.C. § 2314,[5] all in connection with the scheme to defraud CUPAC. In addition Hutchings was charged with three counts of mail fraud in connection with two alleged schemes to defraud the Curators of the University of Missouri and the Kansas City Board of Police Commissioners through misrepresentations concerning the amount of premium due on policies issued to them. The jury acquitted Hutchings on these three counts. At the trial, Hutchings' defense as to the CUPAC charges was that no misrepresentations were made to CUPAC with respect to the Anmat, Meramec, and RJE premiums, because the premium amounts represented to CUPAC properly included the fees going to Hutchings and U.S.C. The jury convicted Hutchings on all fourteen counts relating to the scheme to defraud CUPAC, and he now makes numerous allegations of error before this court.

## II. Grand Jury Proceedings

Taking Hutchings' arguments in the order discussed in his brief, Hutchings first asserts that the postal inspectors who served him with the grand jury subpoenas intentionally misled him to believe that he was not a target of the grand jury investigation. In particular, Hutchings states that seven of the eight subpoenas were directed to various corporations, not to Hutchings himself, and directed him as "Chairman and/or Custodian of Records"

of the corporations to produce some corporate records and documents. Further, the postal inspectors never informed Hutchings that he, personally, was the target of the investigation, nor did they advise him of his Fifth Amendment rights. Because of this "deception," which Hutchings asserts circumvented the exercise of his Fifth Amendment right not to produce documents which may have tended to incriminate him, Hutchings claims that the indictment against him should have been dismissed, or that the evidence seized by the grand jury should have been suppressed.

 Hutchings' argument is not well taken. Although Hutchings argues that the corporations for which he was subpoenaed as custodian of the records are "no more than sole proprietorships" and thus he was entitled to the Fifth Amendment privilege, no such privilege extends to these corporate records. A corporate officer cannot claim his privilege against compulsory self-incrimination to avoid producing corporate records in response to a grand jury subpoena directed to the corporation, *Wilson v. United States*, 221 U.S. 361, 384–85, 31 S.Ct. 538, 545–46, 55 L.Ed. 771 (1911); *Bellis v. United States*, 417 U.S. 85, 88, 94 S.Ct. 2179, 2183, 40 L.Ed.2d 678 (1974), or to the individual corporate officer himself. *Dreier v. United States*, 221 U.S. 394, 400, 31 S.Ct. 550, 55 L.Ed. 784 (1911); *Bellis*, 417 U.S. at 88, 94 S.Ct. at 2183. In addition, the subject of a subpoena has no privilege not to produce handwriting exemplars, fingerprints, or photographs, items which the eighth subpoena directed Hutchings to provide. *See United*

depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, * * * any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

**4.** 18 U.S.C. § 1343 (1982) states in part:

"Whoever, having devised * * * any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, * * * transmits or causes to be transmitted by means of wire * * * in interstate * * *

commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both."

**5.** 18 U.S.C. § 2314 (1982) reads in part:

"Whoever transports in interstate commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, * * * converted or taken by fraud; * * * Shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

*States v. Dionisio,* 410 U.S. 1, 6–7, 93 S.Ct. 764, 767–768, 35 L.Ed.2d 67 (1973).

■ Hutchings contends that the postal inspectors' failure to inform him that he was a subject of the investigation prevented him from exercising his Fifth Amendment privilege. The Supreme Court has held, however, that the Government need not warn a grand jury witness that he is a potential defendant. "[T]he prospect of being indicted does not entitle a witness to commit perjury, and witnesses who are not grand jury targets are protected from compulsory self-incrimination to the same extent as those who are." *United States v. Washington,* 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1977). Thus Hutchings cannot assert that the postal inspectors' failure to advise him that he was a target of the grand jury investigation abrogated his Fifth Amendment right.

In *United States v. Plesons,* 560 F.2d 890, 893–95 (8th Cir.), *cert. denied,* 434 U.S. 966, 98 S.Ct. 506, 54 L.Ed.2d 452 (1977), this court held that neither the failure to warn the defendant that he was a potential defendant or to advise him of his Fifth and Sixth Amendment rights, nor the failure to secure effective waiver of those rights required the suppression of the subpoenaed documents. Although we limited the holding in *Plesons* to the facts of that case, we find more than enough similarities between the cases to reach the same conclusion here. As in *Plesons,* the record here reveals no actual or inherent coercion or compulsion of the defendant. The inspectors served Hutchings in his office, during regular working hours. The inspectors suggested to Hutchings on their visit that he talk to his attorney, and also provided him with a written statement of his right against self-incrimination and his right to consult an attorney. That Hutchings had benefit of counsel at every encounter with the postal inspectors indicates that he was not misled as to his status in the investigation, as he asserts. The trial court properly denied Hutchings' request to either dismiss the indictment against him or to exclude the evidence obtained through the subpoenas.

## III. Denial of the Motion to Sever

Hutchings next maintains that he is entitled to a new trial because the trial court erred in failing to sever Counts I–III of the indictment from Counts IV–XVII. Counts I–III related to the alleged schemes to defraud the Curators of the University of Missouri and the Kansas City Board of Police Commissioners, whereas the remaining counts concerned the alleged scheme to defraud CUPAC. Hutchings alleges that the counts were misjoined in violation of Fed.R.Crim.P. 8(a),[6] or alternatively, were prejudicially joined in violation of Fed.R. Crim.P. 14.[7]

■ In resolving questions of joinder, we first consider whether the counts were properly joined under rule 8(a). *See United States v. Rodgers,* 732 F.2d 625, 628–29 (8th Cir.1984). Rule 8(a) does not require that offenses be of identical nature before they can be joined properly; rather, joinder is appropriate even if the offenses are of similar character, or constitute parts of a common scheme or plan. We are satisfied that the joinder of the counts in the indictment complied with rule 8(a). Although differences exist among the charges as to who was defrauded and how the fraud was actually implemented, all of the charges basically stem from Hutchings' use of his position as president of U.S.C. to obtain money for himself and his corporation

---

6. Fed.R.Crim.P. 8(a) provides:

"*Joinder of Offenses.* Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged * * * are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."

7. Fed.R.Crim.P. 14 provides:

"If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment * * * or by such joinder for trial together, the court may order an election or separate trials of counts, * * * or provide whatever other relief justice requires."

through fraudulent misrepresentations concerning the premiums of insurance policies sold by U.S.C. *Cf. United States v. Rabbitt,* 583 F.2d 1014, 1021 (8th Cir.1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (Joinder proper under Rule 8 because, although distinct, "[t]he charges all originate from Rabbitt's scheme to obtain money because of his power, authority, and influence as a legislator.").

■ Having found that the counts were properly joined under rule 8(a), we must next decide whether the counts nonetheless should have been severed because of prejudice to the defendant Hutchings under rule 14. *See Rodgers,* 732 F.2d at 630. Rule 14 authorizes relief from prejudicial joinder only at the trial court's discretion; the refusal to sever counts properly joined under rule 8 will be reversed only if the discretion was abused so as to prejudice the defendant. *Id.* at 629, 630; *United States v. Bowman,* 602 F.2d 160, 163 (8th Cir.1979). We find no indication that Hutchings was prejudiced by the joinder of the counts in the indictment against him. Hutchings makes vague allegations that the evidence that the jury heard on Counts I–III "engendered latent feelings of hostility" among the jury towards Hutchings, which resulted in his conviction on Counts IV through XVII. We think, however, that the jury's acquittal of Hutchings on Counts I–III rebuts Hutchings' claim of prejudice and evinces the jury's ability to distinguish among the evidence presented on each count. *See United States v. Hastings,* 577 F.2d 38, 40 (8th Cir.1978). The trial court did not abuse its discretion in denying the motion to sever the counts.

## IV. Denial of the Motion for Discovery

■ Hutchings claims that the trial court erred in denying his motion to be furnished with a list of the Government's trial witnesses, and his motion to take depositions. This court has stated repeatedly that issues concerning discovery are committed to the sound discretion of the trial court and are reviewable only upon a show-

ing of abuse of that discretion. *See, e.g., United States v. Vitale,* 728 F.2d 1090, 1093 (8th Cir.1984); *United States v. Pelton,* 578 F.2d 701, 707 (8th Cir.), *cert. denied,* 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978); *United States v. Crow Dog,* 532 F.2d 1182, 1189 (8th Cir.1976), *cert. denied,* 430 U.S. 929, 97 S.Ct. 1547, 51 L.Ed.2d 772 (1977). In denying Hutchings' motion to be supplied with a witness list, the trial court acted well within its discretion. Neither Fed.R.Crim.P. 16(a), governing information subject to disclosure by the Government in criminal cases, nor any other federal rule or statute requires the Government to supply names of potential witnesses to a criminal defendant in a noncapital case. *See Pelton,* 578 F.2d at 708; *United States v. Rogers,* 549 F.2d 490, 494 (8th Cir.1976), *cert. denied,* 431 U.S. 918, 97 S.Ct. 2182, 53 L.Ed.2d 229 (1977). Further, Fed.R.Crim.P. 15, which regulates the taking of depositions in criminal cases, has as its stated objective the preservation of evidence for use at trial. The rule does not have as its purpose to provide a method of pretrial discovery. *United States v. Adcock,* 558 F.2d 397, 406 (8th Cir.), *cert. denied,* 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). In sum, we find no abuse of discretion, nor any exceptional circumstances to warrant interference with the trial court's exercise of its discretion here.

## V. Peremptory Challenges

■ Equally lacking in merit is Hutchings' contention that, because the indictment charged him with seventeen different offenses, he was entitled to ten peremptory challenges per charge under Rule 24 of the Federal Rules of Criminal Procedure. Because the district court limited him to a total of ten peremptory challenges, Hutchings maintains that he should be granted a new trial. This contention has no basis. Rule 24 states in part: "(b) Peremptory Challenges. * * * If the offense charged is punishable by imprisonment for more than one year, the government is entitled to [six] peremptory challenges and the de-

fendant or defendants jointly to [ten] peremptory challenges." The proper joinder of multiple counts in one indictment does not entitle a defendant to an increased number of peremptory challenges. *United States v. Ming,* 466 F.2d 1000, 1006 (7th Cir.), *cert. denied,* 409 U.S. 915, 93 S.Ct. 235, 34 L.Ed.2d 176 (1972); *Nestlerode v. United States,* 122 F.2d 56, 58–59 (D.C.Cir. 1941). *See also United States v. Nelson,* 733 F.2d 364, 368 (5th Cir.1984) (trial court did not err in refusing to grant more than ten peremptory challenges to defendant charged under a four-count indictment); *Estes v. United States,* 335 F.2d 609, 615 (5th Cir.1964), *cert. denied,* 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965) (defendant charged with eighteen separate counts correctly limited to ten peremptory challenges).

## VI. Admissibility of Confederate's Guilty Plea

Hutchings next argues that the trial court erred in allowing his employee Clark Stagner to testify on direct examination that he had pleaded guilty to aiding and abetting Hutchings in the commission of the offenses charged in relation to the CUPAC scheme. Stagner's guilty plea was made in exchange for the government's promise not to bring any more charges stemming from the CUPAC scheme in the Eastern District of Missouri, but with the understanding that he would be subject to perjury charges if he failed to cooperate. Hutchings asserts that Stagner's testimony prejudiced him before the jury because the jury would automatically assume that if Stagner was guilty, Hutchings must be as well. Also, Hutchings attacks Stagner's testimony as improper because it bolstered Stagner's credibility before that credibility had been questioned. The Government responds that the testimony as to the guilty plea was not offered as substantive evidence of Hutchings' guilt, but rather to reflect solely on Stagner's credibility.

We find that the clear view in this circuit is that a confederate's guilty plea is admissible, even on the Government's direct examination of the witness, as evidence of the witness' credibility, or of his acknowledgment of participation in the offense. *See e.g., Wallace v. Lockhart,* 701 F.2d 719, 725–26 (8th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 340, 78 L.Ed.2d 308 (1983); *United States v. Little Boy,* 578 F.2d 211, 212 (8th Cir.1978); *United States v. Wiesle,* 542 F.2d 61, 62 (8th Cir.1976); *Gerberding v. United States,* 471 F.2d 55, 60 (8th Cir.1973). Evidence of the guilty plea cannot be used as substantive evidence of the defendant's guilt, and is properly accompanied by a cautionary instruction from the trial court so advising the jury. *See Wallace,* 701 F.2d at 726. The trial court here did not err in admitting Stagner's testimony as to his guilty plea. The Government did not improperly emphasize the evidence, and did not refer to the plea in its closing argument. Also, the trial court instructed the jury as to the limited admissibility of the guilty plea immediately following the close of Stagner's testimony. The admission of the testimony was well within the guidelines set by this court in *Wallace, Wiesle,* and *Gerberding.*

## VII. Other "Bad Acts" Evidence

Hutchings also contends that the trial court erred in admitting the testimony of government witness Gary Rickert, because the testimony was irrelevant, immaterial, and prejudicial. The objectionable testimony centered around Rickert's business dealings with Hutchings concerning the obtaining of insurance on a hotel owned by Rickert. Specifically, Hutchings argues that testimony implying that Hutchings had illegally pocketed a consulting fee, and that he had breached his contract with Rickert to acquire some property prejudiced him because he was not on trial for these matters.

Again we find Hutchings' objection to be specious. The testimony was admissible under Fed.R.Evid. 404(b)[8] and

---

**8.** Fed.R.Evid. 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to

under the case law in this circuit. The trial judge has broad discretion in admitting wrongful act evidence when: (1) the evidence is relevant to an issue in question other than the defendant's character; (2) clear and convincing evidence exists that the defendant committed the prior wrongful acts, and (3) the potential unfair prejudice of the evidence does not substantially outweigh its probative value. *United States v. Evans*, 697 F.2d 240, 247–48 (8th Cir.), *cert. denied*, 460 U.S. 1086, 103 S.Ct. 1779, 76 L.Ed.2d 352 (1983). The trial judge here acted well within his discretion in admitting the testimony. Like the situations for which Hutchings was indicted in Counts IV–XVII, Hutchings' transaction with Rickert involved financing through CUPAC. The government argues that Rickert's testimony was relevant in establishing Hutchings' knowledge of the proper procedure for disclosing to CUPAC the financing of fees, a procedure not followed in the transactions involving Anmat, Meramec, and RJE. We agree. The testimony thus relfects on Hutchings' motive in concealing the fees from CUPAC in these latter transactions. Because the testimony was relevant to an issue other than the defendant's character, it was properly admitted.

## VIII. Sufficiency of Evidence

Hutchings next argues that insufficient evidence existed that he devised an artifice or scheme to defraud CUPAC, which is a necessary element of a conviction under 18 U.S.C. § 1341 and § 1343. In particular, Hutchings asserts that the Government produced no evidence that he misrepresented to CUPAC the actual premiums to be charged on the policies issued to Anmat, Meramec, and RJE.

■ In reviewing the sufficiency of evidence to support a guilty verdict, we must view the evidence in the light most favorable to the government, and accept all reasonable inferences favorable to the govern-

ment that logically may be drawn from the evidence. *Klein v. United States*, 728 F.2d 1074, 1075 (8th Cir.1984); *United States v. Young*, 702 F.2d 133, 137 (8th Cir.1983). With this in mind, we have examined the evidence produced at trial and find the jury's verdict well supported by the record. Contrary to Hutchings' assertion that the Government did not prove that he devised a scheme to defraud CUPAC, the jury could and did conclude that Hutchings set out to defraud CUPAC. Clark Stagner testified that Hutchings directed him to misrepresent to CUPAC the amounts of the premiums on the Anmat, Meramec, and RJE policies. The evidence also established that Hutchings misrepresented to CUPAC that down payments had been made on these policies when in fact they had not, and that he ordered the policies to be cancelled without ever forwarding to the insurance company any of the money financed through CUPAC, and without informing CUPAC. In fact, it is difficult to contend otherwise; CUPAC presently has lost over $900,000.00 due to the blatant fraud and machinations of Hutchings.

■ Similarly, we disagree with Hutchings' contention that that part of the jury verdict convicting him of violating 18 U.S.C. § 2314 was unsupported by the evidence. Hutchings maintains that the Government failed to prove that, at the time the checks in question were transported in interstate commerce, he had knowledge they had been taken by fraud. Because Hutchings had not reduced the checks to his possession, dominion, or control at the time they were transported, he asserts that they had not yet been "taken by fraud," under the terms of the statute. Hutchings argues that at best the checks were taken by fraud only "after their journey in interstate commerce had been completed."

Again, in examining the sufficiency of the evidence, we must view the evidence in the light most favorable to the Govern-

---

prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such

as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

ment. We agree with the Government that the jury's finding was well-supported by the evidence at trial. All of the misrepresentations made to CUPAC by Hutchings or someone else at Hutchings' direction were made before CUPAC mailed the checks to Hutchings. Robert Dwyer, the CUPAC employee responsible for disbursing the checks to Hutchings, testified that had it not been for these misrepresentations, CUPAC never would have agreed to finance the premiums and would not have sent the checks to U.S.C. Contrary to Hutchings' argument, a prosecution under 18 U.S.C. § 2314 may be maintained even though the fraud does not "reach fruition until arrival of the goods and defendants' physical possession of the [goods]." *United States v. Ferrara,* 571 F.2d 428, 430 (8th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3097, 57 L.Ed.2d 1138 (1978) (goods ordered without any intention to pay for them could be considered stolen once they were loaded on interstate carriers bound for defendant).

## IX. Jury Instructions

▆▆▆ Hutchings makes several allegations of error with respect to the jury instructions given by the trial court. When reviewing jury instructions, we must consider the instructions as a whole. *United States v. Richmond,* 700 F.2d 1183, 1196 (8th Cir.1983); *United States v. Foley,* 683 F.2d 273, 279 (8th Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 463, 74 L.Ed.2d 613 (1982). After examining the contested instructions in the context of the full set of instructions, we conclude that no error exists. The instructions are all clear and correct statements of the law, and are supported by the evidence. Also, the instructions adequately distinguish among the charges, and inform the jury that they could not convict Hutchings on any conduct not alleged in the indictment. Despite Hutchings' repeated protest that the jury was not advised that the specific mailings alleged in the mail fraud counts had to have taken place after the scheme to defraud was devised, we find that the jury was sufficiently instructed that the alleged

mailings had to be made in furtherance of the scheme to defraud.

## X. Conclusion

Because we find none of Hutchings' contentions on appeal to be of merit, and because his convictions are overwhelmingly supported by the evidence, we affirm the judgment of the district court.

Affirmed.

McMILLIAN, Circuit Judge, specially concurring.

I concur in the decision to affirm the judgment of the district court. I fully agree with Judge Gibson's thorough analysis in Parts II–V and VIII and with the result reached in Parts VI and VII. I write separately only to explain the basis for my disagreement with the analysis in Parts VI and VII.

In Part VI appellant argues that the district court erred in allowing appellant's former employee and codefendant Clark Stagner to testify on direct examination that he had pleaded guilty to aiding and abetting appellant in the commission of the offenses charged in connection with the CUPAC scheme. Appellant argues that the testimony about the guilty plea prejudiced him because the jury learned that Stagner had in effect pleaded guilty to several of the very offenses with which appellant was charged. In my opinion appellant's argument has merit. I would not allow the government to introduce evidence as part of its case-in-chief that a codefendant had pleaded guilty to the same or similar offense with which the defendant is charged. "This rule of exclusion is founded upon the notion that a codefendant's guilty plea or conviction with respect to similar or identical charges has only slight probative value on the question of the defendant's guilt, but is extremely prejudicial." *United States v. Miranda,* 593 F.2d 590, 594 (5th Cir.1979); *cf. United States v. Medina-Arellano,* 569 F.2d 349, 356 (5th Cir.1978) (coconspirator's guilty plea to conspiracy other than the one involved in the case not prejudicial). Had the government

introduced evidence of Stagner's guilty plea on redirect following impeachment by the defense, accompanied by an appropriate cautionary instruction from the district court that the guilty plea could not be considered as substantive evidence of guilt, I would have no objection.

> Guilty pleas of co-defendants should be brought to the attention of the jury in only certain narrow instances; i.e., when it is used to impeach trial testimony or to reflect on a witness' credibility in accordance with the standard rules of evidence; where other co-defendants plead guilty during trial and are conspicuously absent; where opposing counsel has left the impression of unfairness which raises the issue or invites comment on the subject.

*United States v. Bryza,* 522 F.2d 414, 425 (7th Cir.1975) (footnote omitted), *cert. denied,* 426 U.S 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). The premature admission of the evidence about Stagner's guilty plea is not grounds for reversal, however, because the evidence of guilt was overwhelming in this case.

In Part VII appellant argues that the district court erred in admitting into evidence the testimony of Gary Rickert. Rickert testified about appellant's arranging contract liability insurance coverage for Rickert's Osage House Hotel and charging an excessive consulting fee and about appellant's breach of an agreement to purchase "flotels" or hotel units built on barges from Rickert. Appellant argues that Rickert's testimony was improperly admitted pursuant to Fed.R.Evid. 404(b). In my opinion Rickert's testimony about appellant's breach of the flotels agreement was irrelevant to the transactions at issue. Although Rickert's testimony about the Osage House Hotel insurance transaction was similar to the schemes to defraud the University of Missouri Board of Curators, the Kansas City Board of Police Commissioners and CUPAC, I believe that its slight probative value was outweighed by its prejudicial impact. However, the admission of Rickert's testimony is not grounds for re-

versal in light of the overwhelming evidence of guilt.