UNITED STATES of America, Appellee,

v.

John D. PLESONS, Appellant.

No. 77–1132.

United States Court of Appeals,
Eighth Circuit.

Submitted June 14, 1977.

Decided Aug. 8, 1977.

Schedule II drugs. In general the scheme involved Dr. Plesons in writing narcotic prescriptions for nonmedical purposes for his coconspirators who then procured the drugs at a pharmacy. Sometimes the names of Dr. Plesons' legitimate patients were used on the prescriptions, though these patients testified at trial they received neither the prescriptions nor the pills.

Medical experts inferred, in answers to hypothetical questions, that prescriptions for narcotics which Dr. Plesons had given were not medically indicated, and were in fact excessive, for the relatively minor complaints the patients were alleged to have.

Dr. Plesons has not challenged the sufficiency of the evidence against him, but appeals his conviction on the basis of the district court's refusal to suppress at trial incriminating evidence obtained by the grand jury from him in the absence of an admonishment of his fifth and sixth amendment rights.[1] Secondly, appellant has alleged that the jury instruction should have, and did not, accurately convey to the jury that to convict they must find that Dr. Plesons prescribed drugs without a legitimate medical purpose and outside of an authorized, professional medical practice where his distribution of such drugs was lawful.

Having considered the two allegations Dr. Plesons makes in detail, we affirm the conviction.

Paul C. Hetterman, St. Louis, Mo., for appellant; Robert J. O'Hanlon and Lawrence J. Lee, St. Louis, Mo., on brief.

Richard E. Coughlin, Asst. U. S. Atty. (argued), and Barry A. Short, U. S. Atty., St. Louis, Mo., on brief for appellee.

Before LAY and ROSS, Circuit Judges, and MILLER, Judge.[*]

ROSS, Circuit Judge.

The appellant, a St. Louis physician, was convicted by a jury on eighteen counts of violating 21 U.S.C. § 841(a)(1) and one count of violating 21 U.S.C. § 846. Specifically, these convictions relate to the unlawful distribution, and a conspiracy to distribute, Dilaudid, Preludin, and Desoxyn, three

## I. The Self-Incrimination Claim

On September 15, 1976, the government subpoenaed Dr. Plesons to appear and testify before a grand jury on the following day. The subpoena was served by two government agents who gave Dr. Plesons a list of twenty patient names and told him to bring his records on these individuals with him

---

[*] JACK R. MILLER, Judge, United States Court of Customs and Patent Appeals, sitting by designation.

1. Appellant also argues that he was never *warned* that he was a "putative" or potential defendant. Whether or not he was a potential defendant, the Supreme Court has decided that a witness need not be warned of the fact that he is a potential defendant. "[P]otential defendant *warnings* add nothing of value to protection of Fifth Amendment rights." (Emphasis added.) *United States v. Washington*, 431 U.S. 181, 189, 97 S.Ct. 1814, 1820, 52 L.Ed.2d 238 (1977).

the next day to the grand jury. Dr. Plesons appeared and testified at the proceedings, referring throughout his testimony to information and notations in the patient files. Dr. Plesons left with his records that day, but the records were demanded subsequently by a *second* subpoena dated October 4, 1976, which required their production for the grand jury.[2] It is apparently undisputed that at no time prior to his arrest did the government inform Dr. Plesons of his right to secure counsel or his right to refuse to incriminate himself, or that if he waived such right his voluntary testimony could be used as evidence against him.

■ Initially in his brief Dr. Plesons had claimed error in the failure of the trial court to suppress both incriminating grand jury testimony given without warnings and the incriminating medical records subpoenaed later. However at oral argument counsel for the appellant abandoned the claim concerning the grand jury testimony because of the limited use which had been made of it at trial. As the appellant apparently concedes limited use of the grand jury *testimony* at trial, we conclude that any error in failing to warn the appellant at that stage of the proceedings was, if error at all, a harmless one. *See United States v. Donahey,* 529 F.2d 831, 832 (5th Cir. 1976).

The primary claim of the appellant rests on the extensive use which the prosecution made of Dr. Plesons' medical records, which had been surrendered to the grand jury without an admonishment to Plesons by the government of his right to refuse to do so.

At an early date, the Supreme Court established that the fifth amendment's proscription that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself" applied to one who appeared as a grand jury witness and was there asked incriminating questions.

2. The subpoena was dated October 4, 1976, but demanded production of the records before the grand jury on October 13, 1976. Apparently Dr. Plesons gave the records to the agents on October 4.

3. The records in question are folders on individual patients with the patient name typed at the top. Sheets of paper and notecards show,

The object [of the fifth amendment] was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime. The privilege is limited to criminal matters, *but it is as broad as the mischief against which it seeks to guard.*

*Counselman v. Hitchcock,* 142 U.S. 547, 562, 12 S.Ct. 195, 198, 35 L.Ed. 1110 (1892) (emphasis added). This conclusion continues to be reaffirmed: "[I]t is well settled that the Fifth Amendment privilege extends to grand jury proceedings, *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892) * * *." *United States v. Washington, supra,* 431 U.S. at 186, 97 S.Ct. at 1818.

■ We conclude that the privilege against self-incrimination could have been exercised by Dr. Plesons when presented with the grand jury subpoena, had he elected to do so, if the medical records in question fell within the ambit of *documents* which the fifth amendment will protect. The Supreme Court observed at an early date that "we have been unable to perceive that the seizure of a man's private books and papers to be used in evidence against him is substantially different from compelling him to be a witness against himself. We think it is within the clear intent and meaning of those terms." *Boyd v. United States,* 116 U.S. 616, 633, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886). In spite of the Supreme Court's recent observation that *Boyd,* in some aspects, has been narrowed through the years, *Fisher v. United States,* 425 U.S. 391, 407, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976), we feel the records here do come within the historic area of protection afforded by the fifth amendment to private documents.[3] In

for example, the patient's age, his complaints, a diagnosis and progress notes; prescriptions given the patient and corresponding dates are noted as well. The subpoena also requested Dr. Plesons' appointment books and records of appointments from August 1975 to September 1976.

the *Fisher* case the Court discussed, in the context of the attorney-client privilege, the theory which it felt justified the protection of documents as compelled *testimonial* communications under the fifth amendment. It is, the Court says, "[t]he 'implicit authentication' rationale [which] appears to be the prevailing justification for the Fifth Amendment's application to documentary subpoenas." *Fisher v. United States, supra,* 425 U.S. at 412 n. 12, 96 S.Ct. at 1581. Here, unlike the *Fisher* case where the taxpayer could not authenticate his accountant's workpapers, the doctor prepared the records and could vouch for their accuracy; his compliance with the subpoena in this case acted as an assurance that the patient records produced were the ones demanded. *Id.* at 413, 96 S.Ct. 1569. *Cf. United States v. Miller,* 425 U.S. 435, 440, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976). In *Hill v. Philpott,* 445 F.2d 144 (7th Cir.), *cert. denied,* 404 U.S. 991, 92 S.Ct. 533, 30 L.Ed.2d 542 (1971), it was "not refuted" that the physician's seized records which included, among many other types of records, "patient folders and their contents," were "generally considered privileged from disclosure by a taxpayer under the Fifth Amendment." *Id.* at 146. In *Bellis v. United States,* 417 U.S. 85, 87–88, 94 S.Ct. 2179, 2182, 40 L.Ed.2d 678 (1974), the Supreme Court clearly pronounced that "[t]he privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life."

Furthermore, the subpoenaed medical records were in the *possession* of Dr. Plesons and were turned over to authorities by him, a fact which avoids the issue which the Supreme Court has recently raised when private papers are out of the hands of one seeking to exercise the privilege. "In *Couch v. United States* [409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973)] we recently ruled that the Fifth Amendment rights of a taxpayer were not violated by the enforcement of a documentary summons directed to her accountant and requiring production of the taxpayer's own records in the possession of the accountant. We did so on the

ground that in such a case 'the ingredient of personal compulsion against an accused is lacking.' " *Fisher v. United States, supra,* 425 U.S. at 397, 96 S.Ct. at 1574.

We know then of no reason why the fifth amendment's protection would not have extended to Dr. Plesons and his private medical papers had he chosen to refuse to produce them. The fact remains, however, that Dr. Plesons turned them over, that they incriminated him, and that the prosecuting attorney introduced them as evidence of the crimes for which he was convicted. At trial, the records were introduced in the government's case-in-chief. They were identified for admission into evidence by Drug Enforcement Agent Robert Jones who testified that the documents were the patient records seized by him from Dr. Plesons at his office pursuant to the October 4 subpoena. Counsel for Dr. Plesons then renewed his objection to the evidence which the court had earlier refused to suppress. The records proved to be incriminating. Statements read aloud in court from the files of patients concerning alleged health problems, for example, overweight, were contradicted when a patient took the stand and denied ever having received treatment for that problem or the Preludin diet pill prescriptions.

As Dr. Plesons was given no warnings by the government, the question avoided in *United States v. Washington, supra,* 431 U.S. at 190, 97 S.Ct. 1814, is presented, and we must consider whether the failure to warn Dr. Plesons and to secure an effective waiver of his rights should result in the suppression of the documents. We conclude in the circumstances of this case, it should not.

■ Much of the recent debate over warnings for grand jury witnesses centers on the dictum that if one "desires the protection of the privilege, he must claim it * * *." *United States v. Mandujano,* 425 U.S. 564, 575, 96 S.Ct. 1768, 1776, 48 L.Ed.2d 212 (1976), *citing United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943). "Absent a claim of privilege, the

duty to give testimony remains absolute." *Id.* 425 U.S. at 575, 96 S.Ct. at 1776. Yet it is clear in an analysis of fifth amendment problems that it is *compulsion* which is condemned and that element must be examined initially. In the absence of compulsion, a witness may volunteer incriminating testimony, if that is his choice. *United States v. Washington, supra,* 431 U.S. at 186, 97 S.Ct. 1814. It is over the assessment of what constitutes compulsion, and which policies the proscription against compelled testimony is designed to protect, that the rift is created. The fifth amendment has been viewed as the guardian of each individual to resist making any incriminating utterances not the product of his free will.

In this case we do not decide that no situation exists in which warnings would be required to protect the free exercise of constitutional rights before a grand jury; we decide only that the record here reveals no actual compulsion or coercion, and that Dr. Plesons' situation in responding to the documentary summons did not contain elements of *inherent* coercion. Furthermore, we see no denigration of the adversary system of justice by the failure to warn in this case.

Dr. Plesons has not pointed in his brief to any incidents or circumstances which would give us cause to believe his free will was overborne. *See United States v. Washington, supra,* 431 U.S., at 188, 97 S.Ct. 1814, *citing Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961). His argument rests primarily on an analogy to *Miranda* where the Court concluded "that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains *inher-*

*ently compelling* pressures which work to *undermine the individual's will to resist* and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures * * * the accused must be adequately and effectively apprised of his rights * * *." *Miranda v. Arizona,* 384 U.S. 436, 467 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966) (emphasis added). The Court in *Miranda* turned its attention to the menacing atmosphere encountered by an in-custody defendant interrogated incommunicado at the police station: "[a]n individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion described above cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than in courts or other official investigations * * *." *Id.* at 461, 86 S.Ct. at 1621.

■ We are unable to find a similar inherently coercive setting in this case. Plesons was served with the documentary summons several weeks after his appearance and testimony in the grand jury room.[4] He was served in his office and there turned the records over to the drug enforcement agents. He was not taken into custody. More importantly, he had, since the beginning, been in contact with a lawyer. Immediately after the first subpoena was issued on September 15, 1976, and the request to bring records along was made, Plesons "called my friend Bob Ahrens and I talked to him about the subpoena and about the 20 records." He asked Ahrens, a lawyer, "what to do." According to Plesons, Ahrens told Plesons he'd be there at the grand

---

4. It is disputed whether or not Plesons was a "putative defendant," that is whether the grand jury investigation had focused on him at the time he was called to testify. Mr. Coughlin, the government prosecutor, asserts he was not suspect at that time, and the trial court found that the narcotic agents' report on the pharmacy, which placed Plesons in suspicious circumstances, was not available to Coughlin before the grand jury session.

Coughlin admitted "that approximately half-way through I started getting my suspicions

* * *." Therefore, it may well be true that at the time of the documentary summons several weeks later Plesons was suspect and the government was aware that it sought incriminating disclosures. This factor *alone* seems insufficient to exclude evidence subpoenaed without a prior warning and waiver where the circumstances otherwise showed no compulsion, and where counsel could have helped appellant effectively exercise the right to retain the records.

jury the next day but, Plesons alleges, told him no more, and did not explain to him his right to remain silent. Whether or not Ahrens did inform Plesons of the privilege is a point in dispute.

Mr. Coughlin, the prosecutor, testified at the suppression hearing that Mr. Ahrens called him after the physician had called Ahrens; that Coughlin asked counsel if there was any chance the doctor was in on this; Ahrens allegedly assured Coughlin of the doctor's noninvolvement. At some point, Coughlin testified, Ahrens told him he'd told the physician "if you have got nothing to hide go ahead and testify." Plesons testified that his lawyer did come to the September 16, 1976, proceedings as promised, but did not arrive until Plesons was leaving the grand jury room. Ahrens then met Plesons as he left the grand jury room, and accompanied him while Plesons gave handwriting exemplars. Plesons was not in custody and the records were not subpoenaed until several weeks later.

We do not resolve the conflict in the evidence as to whether or not Plesons was in fact informed of his rights by *his* attorney prior to his testimony or the surrender of his records; it is not necessary to do so. We consider the setting here far removed from the circumstances of custodial interrogation which inspired the Court in *Miranda* to institute warnings as safeguards to the exercise of constitutional rights. *See also Beckwith v. United States*, 425 U.S. 341, 96

S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Garner v. United States*, 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976).

■ We thus find no inherent pressure in Dr. Plesons' situation to involuntarily incriminate himself, and no requirement of a knowing and voluntary waiver of the privilege in his situation. Though warnings would be a preferable practice, we decline to hold that fifth amendment policies were sacrificed by the admission of the documentary evidence here; [5] a future case in the grand jury setting may require a different result.

## II. *Jury Instruction Claim*

Appellant secondly claims prejudicial error in the refusal of the trial court to specifically instruct, as an added element of the offense, that the jury must find that the prescriptions were not written in the normal course of professional practice and that they served no legitimate medical use or purpose under the circumstances. Counsel for the appellant made this objection specifically as to Counts II through XX, the substantive counts charged; he did not object on *this* basis to the conspiracy count. Due to our disposition of this claim on other grounds, we will not discuss the government's allegation that the error was not properly preserved.

In *United States v. Moore*, 423 U.S. 122, 96 S.Ct. 335, 46 L.Ed.2d 333 (1975), the

---

5. We likewise reject appellant's due process claim which is based on the appeals court decision in *United States v. Wong*, 553 F.2d 576 (unpublished) (9th Cir., filed Sept. 23, 1974), *rev'd*, 431 U.S. 174, 97 S.Ct. 1823, 52 L.Ed.2d 231 (1977). In that case the appellee was subpoenaed to testify before the grand jury; she was a target of the grand jury and was likely to be indicted. She was warned of her right against self-incrimination, but she nevertheless gave *false* answers to the incriminating questions. She was prosecuted for perjury.

However, both the trial court and appeals court suppressed the testimony after finding that due to her limited understanding of the English language she had not understood the self-incrimination warning. That holding rested on the fifth amendment *due process* clause. The appeals court said; "perjurious answers were induced by an unfair procedure * * *.

That unfairness stems from the threat the procedure poses to the values protected by the privilege." *United States v. Wong, supra*, 553 F.2d 576, at 577. The Supreme Court reversed, holding that even in the absence of warnings, *perjury* is not justified and a grand jury witness who lies may be prosecuted. The Supreme Court analyzed the appeals court *due process* holding: "the core of respondent's due process argument, and of the Court of Appeals' holding, in reality relates to the protection of values served by the Fifth Amendment privilege * * *." *United States v. Wong, supra*, 431 U.S. at 180, 97 S.Ct. at 1826.

We agree that in this situation the due process and self-incrimination claims are basically the same. We have already decided that fifth amendment values were not endangered by the disclosures, without warnings, made pursuant to the documentary summons in this case.

Supreme Court decided that medical practitioners were subject to prosecution under 21 U.S.C. § 841(a)(1) of the Controlled Substances Act, and reversed the court of appeals' holding that the physician was exempt from prosecution due to his status as a "registrant" under the Act. *Id.* at 131, 96 S.Ct. 335. The Court observed that "[u]nder the Harrison Act physicians who departed from the usual course of medical practice were subject to the same penalties as street pushers with no claim to legitimacy. * * * There is no indication that Congress intended to eliminate the existing limitation on the exemption given to doctors." (Footnote omitted.) *Id.* at 139, 96 S.Ct. at 344.

In this particular case the trial court instructed the jury that the defendant John D. Plesons was a licensed physician and a " 'practitioner' within the meaning of Federal law, and entitled to prescribed [sic] controlled substances within the normal course of his medical practice." The court then read portions of a regulation promulgated pursuant to the Controlled Substances Act stating the "purpose" of the issuance of a prescription. *See* 21 C.F.R. § 1306.04(a). The court quoted as follows:

> It is further a part of Federal law that "a prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice . . . An order purporting to be a prescription, issued not in the usual course of professional treatment . . . is not a prescription within the meaning and intent (of Federal law) and the person knowingly filling such a purported prescription, as well as the person issuing it, shall be subject to the penalties provided for violations of the provisions of law relating to controlled substances."

In addition, the court read the entire indictment to the jury. In the conspiracy count it charged that: "[i]t was a further part of said conspiracy that John D. Plesons would and did write prescriptions for Dilaudid and Preludin in the names of persons referred to him by Peggy Lee Linze and Lawrence Alfred Smith well knowing at the time of writing said prescriptions that he had not treated those patients on the dates reflected on the prescriptions, and knowing that they would not be using the drugs so prescribed *for any legitimate medical purpose.*" (Emphasis added.) This phrase, "not * * * for any legitimate medical purpose" or "legitimate purpose" was repeated throughout the *conspiracy* charge thirty-two times in describing various aspects of the conspiracy.

 The substantive counts charged that "John D. Plesons, M.D., a registered physician, knowingly and intentionally, and *not in the usual course of professional practice,* did distribute and dispense a quantity of Preludin * * *." (Emphasis added.) In the context of the nineteen substantive counts charged, this phrase was repeated to the jury nineteen times. Moreover, the jury was next told that "as to each count of the indictment the burden is upon the Government to prove the *charges contained in such count* against the defendant; that burden the Government assumes in the beginning and carries throughout the trial, and the Government can meet this burden as to each count only by showing to you the guilt of the defendant *as to such count beyond a reasonable doubt.*" (Emphasis added.) The jury was instructed they must believe the acts were intentionally, willfully and knowingly done by the defendant. After reading the entire charge we are convinced the jurors understood that to convict Dr. Plesons he must have exceeded the bounds of professional practice in prescribing the drugs beyond a reasonable doubt.

A preferable instruction may have stated the exception more explicitly, and affirmatively, in the sense that a registrant who *does* prescribe in the usual course of professional practice is *not* subject to the penalties of that section. *See White v. United States,* 399 F.2d 813, 817 (8th Cir. 1968). A clearer statement of the "exception" is

found in *United States v. Rosenberg*,[6] 515 F.2d 190, 197 (9th Cir.), *cert. denied*, 423 U.S. 1031, 96 S.Ct. 562, 46 L.Ed.2d 404 (1975), and a similar explanation to a jury should be given for the sake of clarity. However, considering the instructions as a whole, we find no prejudicial error in the instruction challenged here. The instruction given in this case is distinguishable from the jury charge read in *United States v. Carroll*, 518 F.2d 187 (6th Cir. 1975), where the court read only statutory definitions such as "dispense," "distribute" and "practitioner," even after the foreman had specifically returned to ask on behalf of the jury if there were any "exceptions" of which they should be aware.

For the reasons set forth above, we affirm the conviction.

---

**6.** (t)he law makes it unlawful for any person to distribute a controlled substances [sic] except a practitioner who causes the controlled substance to be *distributed in the course of professional practice.* If this doctor was causing the controlled substance to be prescribed while acting as a doctor *in the course of his professional practice, then there's no violation.* However, if he was not acting in good faith as a doctor, but simply pushing pills, as counsel has said, then he does not come within the *exception*, and the law is violated.

*United States v. Rosenberg, supra*, 515 F.2d at 197 (emphasis added).

Note that language from the regulation was part of the indictment in that case. The court saw no difference in the meanings of the statutory phrase "in the usual course of professional practice" and the regulations' phrase, "legitimate medical purpose." *Id.* We agree.