UNITED STATES of America and Gerald T. Padar, Petitioners,

v.

Helen V. PORTER and Nickolaus Beligratis, Respondents.

No. 81 C 2851.

United States District Court, N.D. Illinois, E.D.

Dec. 3, 1982.

On Motion for Reconsideration Dec. 30, 1982.

Supplement to Memorandum Opinion and Order Feb. 3, 1983.

Dan K. Webb, U.S. Atty., Kevin J. Egar, Asst. U.S. Atty., Chicago, Ill., Robert G. Nath, Tax Div., U.S. Dept. of Justice, Washington, D.C., for petitioners.

Helen V. Porter, for Nickolaus Beligratis.

Lewis M. Porter, Boodell, Sears, Surgrue, Giambaluo & Crowley, Chicago, Ill., for Helen V. Porter.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SHADUR, District Judge.

In this action the United States and Internal Revenue Service ("IRS") Special Agent Gerald T. Padar ("Padar") (collectively "Petitioners") seek enforcement of three IRS summonses, one issued to Nickolaus Beligratis ("Beligratis") and the other two to Beligratis' attorney, Helen Viney Porter ("Porter") (Beligratis and Porter are collectively "Respondents"). This Court has conducted an evidentiary hearing (the "Hearing") and, in accordance with Fed.R. Civ.P. ("Rule") 52(a), makes the following findings of fact and conclusions of law.

*Findings of Fact ("Findings")*

1. During 1976–78 Beligratis was the sole proprietor of two beauty salons known as Grecian Goddess and Lady of Castille (Tr. 54). During that period Beligratis engaged accounting firm Byrne & Co. ("Byrne") to perform various accounting and bookkeeping services, including preparation of the federal tax returns now under IRS investigation and, with the aid of a data processing center (Tymshare, Inc.), Beligratis' books of account (Tr. 60–75, 104). Documents so prepared by or under the direction of Byrne comprised (Tr. 62, 92) income statements, balance sheets and general ledgers (collectively "financial statements"), payroll records, bank reconciliation sheets (Tr. 83–88), federal payroll tax returns (Forms 941), personal income tax returns (Forms 1040), Forms W–2, federal unemployment tax returns (Forms 940) and State of Illinois unemployment compensation tax forms.

2. To enable Byrne to prepare the documents referred to in Finding 1, Beligratis furnished Byrne with three types of business records written by Beligratis:

   (a) carbon copies of checks;
   (b) cash disbursement records; and
   (c) monthly sales sheets.

Beligratis also provided Byrne with bank account statements accompanied by cancelled checks (Tr. 65, 67, 80). Finally Beligratis provided Byrne with the remaining information required for preparation of Beligratis' Form 1040 personal income tax return through a personal interview after the close of each calendar year (Tr. 89–91, 106–10).

3. Byrne's regular practice was to transmit one copy of each financial statement to Beligratis and retain one copy in Byrne's own files for a 3–5 year period (Tr. 96–100, 115), and to do the same with respect to Beligratis' Form 1040 (retained at least 3 years, Tr. 71) and the other forms and returns referred to in Finding 1 (retained 3–5 years, Tr. 73, 88, 99). Payroll records (prepared by Byrne from Beligratis' duplicate checks) and bank reconciliation sheets (prepared by Byrne from the bank's cancelled checks) were retained by Byrne for 3–5 years (Tr. 73, 88). Byrne considered its retained copies of the financial statements belonged to Beligratis and were retained by it for his convenience (Tr. 105–07).

4. In the summer of 1979 IRS began a civil examination of Beligratis' returns. In the course of the audit IRS Examination Division Agent Joseph Marmoll reviewed the various documents in Byrne's possession relating to Beligratis' two proprietorships and his personal finances (Tr. 53–58). Those documents comprised:

   Profit and loss statements (including income statements and balance sheets)

   General ledgers

   Bank reconciliation sheets on accounts included in the general ledger

   Byrne input sheets

   Payroll tax returns (Forms 941)

   Forms W–2

   All checking account statements pertaining to the two proprietorships

   90% of all cancelled checks and deposit tickets

   Three months of cash receipts records written by the taxpayer

5. Beginning in the fall of 1979 IRS' Criminal Investigation Division and Examination Division conducted a joint investigation to determine whether Beligratis had violated any Internal Revenue laws as well as to determine Beligratis' correct income tax liability for the years 1976–78. Special Agent Padar was assigned to lead the joint investigation (Tr. 15–16). There has been no recommendation by IRS to the Department of Justice for criminal prosecution of Beligratis, and the investigation is not being conducted solely for a criminal prosecution purpose.

6. During the regular course of the investigation in early April 1980, Padar interviewed Beligratis and requested a wide range of records pertaining to his personal finances and business affairs (Tr. 16–17). Beligratis said they were in Byrne's possession and that he would make them available (Tr. 17–18).

7. Shortly thereafter Beligratis retained Porter as his lawyer to represent him during the IRS investigation (Tr. 19, 122–23). In accordance with Porter's advice, in April 1980 Beligratis obtained most of the relevant documents from Byrne and delivered them to Porter. Byrne turned over all remaining records to Porter in June 1980 (Tr. 18–20, 123–24, Resp.Ex. A ¶¶ 3–4). Porter is now in possession of all business and personal financial records relating to Beligratis and referred to in earlier Findings, except for the records turned over to the IRS (see Finding 11) (Tr. 127–28).

8. On August 21, 1980 Padar served an IRS summons (Govt.Ex. 3) on Porter (Tr. 21), requiring Porter on September 8, 1980 to produce four categories of documents:

(a) records relating to Beligratis' personal checking and savings accounts and his business checking accounts, including bank statements, cancelled checks, deposit slips, statements of interest earned (Forms 1099) and statements of interest paid on personal and business loans;

(b) cash receipts journals, cash disbursements journals and appointment books or records of services provided, of Beligratis' beauty salons;

(c) retained copies of "employee withholding tax returns," including Schedules A and Forms W–2 or 1099s issued to employees; and

(d) any other information or papers relevant to determination of Beligratis' tax liability for 1976, 1977 or 1978;

and to testify as to Beligratis' tax liability (or its collection) for the 1976–78 years.

9. On the September 8, 1980 return date, Porter appeared before Padar and refused to comply with the summons. Porter claimed the government already possessed the documents included in category (c). As for the documents in categories (a), (b) and (d) Porter invoked the attorney-client privilege on the ground that the Fifth Amendment privilege against self-incrimination would justify withholding production if the documents were in Beligratis' possession (Tr. 125). Porter has not denied having possession of the documents demanded by the summons (Tr. 22) and is in fact in possession thereof (Resp.Ex. A ¶¶ 3–4, Govt.Ex. 5, 6).

10. On September 23, 1980 Padar served a second IRS summons (Govt.Ex. 1) on Porter (Tr. 22–23), requiring Porter on October 14, 1980 to produce all documents of Byrne relating to Beligratis' beauty salons from December 1, 1975 through January 31, 1979 including:

1. balance sheets;
2. profit and loss statements;
3. cash disbursements journal, cash receipts journal and general journal;
4. general and subsidiary ledgers;
5. payroll records;
6. sales tax records;
7. accounting workpapers; and
8. computer input sheets;

and to testify as to the same matters referred to in Finding 8.

11. On the October 14, 1980 return date Porter appeared before Padar and turned over to him some "accounting workpapers" (adding machine tapes and schedules), together with "computer input sheets" (Data Input Register, Form ABA–4; Transmittal and Recap, Form ABA–O; reconciliation sheets, bank balance sheets and additional adding machine tapes) for all designated months except December 1975 and two other months (Tr. 23). Again asserting the attorney-client privilege, Porter refused to produce the documents in the remaining categories (id.). As with the earlier summons, Porter has not denied having possession of the documents demanded by the second summons (Tr. 24–25) and is in fact in possession thereof (Resp.Ex. A ¶¶ 3–4, Govt.Ex. 5, 6).

12. Except for the documents referred to in Finding 11 as having been turned over by Porter, the United States is not in possession of any of the testimony, books, records, papers or other data demanded by the summonses referred to in Findings 8 and 10 (Tr. 22, 24–25).

13. On December 31, 1980 Padar served a summons (Govt.Ex. 2) on Beligratis (Tr. 24–26), requiring Beligratis on January 12,

1981 to produce the same documents as described in the summons referred to in Finding 10, including the eight categories described in Finding 10 and:

9. summaries and/or ledgers reflecting deposits and/or withdrawals as to personal checking and savings accounts and business checking accounts;

10. summaries and/or statements of interest earned, or interest paid on any personal or business loan;

11. summary sheets of sales and/or services provided of the beauty salons; and

12. lists of employees or retained copies of Employer's Quarterly Federal Tax Returns (Form 941), including Schedules A, Forms W-2 or 1099 issued to employees;

and to testify as to Beligratis' tax liability (or its collection) for the 1976–78 years.

14. On January 14, 1981 (the summons' extended return date) Beligratis and Porter met with Padar to explain the basis for Beligratis' non-compliance with the summons referred to in Finding 13. Porter stated (a) documents in categories 7 and 8 had already been given to Padar (see Finding 11), (b) the government already possessed the documents in category 12 and (c) Beligratis' Fifth Amendment privilege protected from production documents in categories 1–6 and 9–11, whether in Beligratis' or Porter's possession (Tr. 126).

15. At the Hearing Porter asserted the attorney-client privilege also protected against production of the documents discussed in category (c) of the summons referred to in Finding 8 (and in category 12 of the summons referred to in Finding 13).

### Conclusions of Law ("Conclusions")

1. This Court has jurisdiction of this action and of the parties under the Internal Revenue Code of 1954, 26 U.S.C. §§ 7402(a) and 7604(b). Jurisdiction is undisputed.

2. There is likewise no dispute as to the facts establishing Petitioners' prima facie case for enforcement. *United States v. Powell,* 379 U.S. 48, 57–58, 85 S.Ct. 248, 254–55, 13 L.Ed.2d 112 (1964). All three summonses were properly issued and served during the course of a legitimate investigation into the correctness of Beligratis' federal tax returns and the amount of Beligratis' federal income tax liability for 1976, 1977 and 1978. *Id.* There has been no IRS recommendation to the Department of Justice for Beligratis' criminal prosecution, and the investigation is not being conducted solely for a criminal prosecution purpose. *United States v. LaSalle National Bank,* 437 U.S. 298, 98 S.Ct. 2357, 57 L.Ed.2d 221 (1978). IRS possesses none of the documents demanded in the summonses, except for the documents referred to in Finding 11, as to which enforcement is not sought.[1]

3. Respondents therefore have the burden of demonstrating a sufficient defense to enforcement. *United States v. Kis,* 658 F.2d 526 (7th Cir.), *cert. denied sub nom. Salkin v. United States,* 455 U.S. 1018, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). In that respect Respondents urge the Fifth Amendment in conjunction with the attorney-client privilege immunizes all the unproduced documents from compelled production.

4. *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) teaches:

(a) Attorneys cannot directly invoke their clients' Fifth Amendment privilege to resist production of the clients' documents in their possession, (*id.* at 396–98, 96 S.Ct. at 1573–74), even though the attorneys are agents for the clients (relying on *Couch v. United States,* 409 U.S. 322, 328–29, 93 S.Ct. 611, 615–16, 34 L.Ed.2d 548 (1973)).

*United States v. First National State Bank of New Jersey,* 616 F.2d 668 (3d Cir.), *cert. denied sub nom. Levey v. United States,* 447 U.S. 905, 100 S.Ct. 2987, 64 L.Ed.2d 854 (1980).

---

1. Respondents' proposed Conclusions 4 and 5 have effectively conceded the two forms covered by the summonses are not deemed to be in the government's possession simply because they have been filed by the taxpayer. *See*

(b) Attorneys and clients must therefore look to "the relevant body of law and policies that govern the attorney-client privilege" as the predicate for noncompliance with summonses like those in this case. *Fisher,* 425 U.S. at 402, 96 S.Ct. at 1576.

(c) If the attorney-client privilege is otherwise available [2] and if a document would have been privileged in the client's hands by reason of the Fifth Amendment, the attorney-client privilege immunizes the document from production in the attorney's hands. *Id.* at 403–05, 96 S.Ct. at 1577–78. That principle applies only to "those disclosures—necessary to obtain informed legal advice—which might not have been made absent the privilege." *Id.* at 403, 96 S.Ct. at 1577.

There is no question the documents here were delivered to Porter to facilitate her legal representation—but it appears that the principal respect in which such facilitation was sought to be implemented was to make available the attorney-client privilege (which the documents would not have enjoyed in Byrne's hands), rather than to "obtain informed legal advice" as such. None-theless Respondents will be given the benefit of the doubt by treating delivery of the documents as fitting within the language from *Fisher* quoted in (c). *Fisher* itself, after all, also involved the client's delivery of accountant-generated documents to the lawyer.

■ 5. Under *Fisher,* then, Respondents cannot resist enforcement of the three summonses to a *greater* extent than Beligratis himself could successfully claim his Fifth Amendment privilege against self-incrimination (assuming he in fact possessed the desired records). That question requires detailed analysis.

6. Such analysis again looks to *Fisher,* the most recent Supreme Court pronouncement delineating the scope of the Fifth Amendment privilege in the summons context. It construed the Amendment as forbidding compelled production of documents voluntarily prepared (even by the person asserting the privilege) only if the *act of production itself* tacitly imparts an incriminating testimonial communication (425 U.S. at 409–14, 96 S.Ct. at 1580–82).[3] On that

**2.** This aspect of *Fisher* is disputed vigorously by Respondents and, it is true, was not required to be confronted directly in that case (that is, the documents involved in *Fisher* had not been disclosed to any third party, posing questions of waiver of the attorney-client privilege). By contrast, in this case IRS Agent Marmoll had been given access to and reviewed the disputed documents while in Byrne's possession (Finding 4). That poses a question as to the scope of *Fisher* under such circumstances:

(a) On the one hand *Fisher* says (425 U.S. at 403, 96 S.Ct. at 1577):

Confidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged.

And the documents sought cannot fairly be called "confidential" under the circumstances. Moreover the entire thrust of requiring attorney-client privilege analysis as the rationale for immunization would appear to call for applying the substantive limitations on *that privilege.* Indeed this is the construction given *Fisher* by *United States v. Davis,* 636 F.2d 1028, 1040 (5th Cir.1981), one of the cases on which Respondents' memorandum relies.

(b) On the other hand *Fisher* seeks to avoid discouraging clients from document disclosure to their attorneys, thus promoting the unfet-tered ability to obtain informed legal advice (*id.* 425 U.S. at 404, 96 S.Ct. at 1577):

It is otherwise if the documents are not obtainable by *subpoena duces tecum* or summons while in the exclusive possession of the client, for the client will then be reluctant to transfer possession to the lawyer unless the documents are also privileged in the latter's hands. Where the transfer is made for the purpose of obtaining legal advice, the purposes of the attorney-client privilege would be defeated unless the privilege is applicable.

Neither party has discussed whether Byrne's *disclosure of the documents to Marmoll would* have made the Fifth Amendment privilege unavailable to Beligratis had he thereafter gotten the documents from Byrne and then *kept* them. Again Respondents will be given arguendo the benefit of the more favorable application of *Fisher* as to any testimonial aspects of *production* (but not as to the documents' contents— see n. 3).

**3.** Any arguably incriminating *content* of the documents was held *not* similarly insulated, for their author (the accountant) had *voluntarily* disclosed such information. 425 U.S. at 410, 96 S.Ct. at 1581. In this case the disclosure of the contents was doubly voluntary—once in the preparation of the documents by Byrne (a situ-

basis the taxpayer's attorneys were ordered to produce the following records of his accounting firm:[4]

   (a) the accountant's workpapers pertaining to the taxpayer's business records;

   (b) retained copies of the taxpayer's income tax returns; and

   (c) retained copies of "reports and correspondence" from the accounting firm to the taxpayer.

*Fisher* acknowledged such production would have two communicative aspects: It would reveal the existence of the papers demanded (or at least the existence of papers the taxpayer believed to be those described in the subpoena) and their possession or control by the taxpayer (*id.* at 410, 96 S.Ct. at 1581). But neither of those implicit averments was sufficiently "testimonial" for Fifth Amendment protection, because (*id.* at 411, 96 S.Ct. at 1581):

   The existence and location of the papers are a foregone conclusion and the taxpayer adds little or nothing to the sum total of the government's information by conceding that he in fact has the papers.

Moreover, *Fisher* discounted the threat of self-incrimination by production of the accountant's papers for two reasons. First, compliance with the subpoena at most manifests the taxpayer's *belief* the documents are what they purport to be and thus could not offer any evidence of authenticity. Second, the Court referred to a line of cases obligating a custodian of records to obey a

documentary subpoena even though production of the documents "would itself be sufficient authentication to permit their introduction against him." *Id.* at 413 n. 14, 96 S.Ct. at 1582 n. 14. That reference intimates the prospect of implicit authentication—at least as to documents authored by third parties—does not implicate the Fifth Amendment.

   7. *Fisher*'s specific holding and underlying rationale thus preclude Beligratis from wrapping himself in the Fifth Amendment's mantle as to all but the first of four general classes into which the documents sought in the summonses may be divided:

   (a) documents prepared by Beligratis for his own use;[5]

   (b) documents prepared by someone other than Beligratis for Beligratis' use;[6]

   (c) retained copies of documents prepared by someone other than Beligratis to be filed with the government;[7] and

   (d) documents prepared by someone other than Beligratis for the preparer's use.[8]

*Fisher* upheld summonses clearly calling for type (c) and (d) documents, and possibly type (b) documents as well.[9] Moreover, none of the documents in those three classes tacitly concedes more "testimonial" information than those subpoenaed in *Fisher*. Only their existence and control by the taxpayer is divulged. Nor would producing those documents create a greater danger of implicit authentication. True enough, Beligratis' compliance with the subpoena, by

---

ation parallel to *Fisher*) and again in permitting Marmoll to review them.

**4.** Before issuance of the summonses the taxpayer (like Beligratis here) had obtained the documents from the accounting firm and transferred them to his lawyers to secure more informed legal advice.

**5.** Cancelled checks, deposit slips, and appointment books (Govt.Ex. 3, categories 1 and 2).

**6.** Balance sheets, profit and loss statements, cash disbursements journal, cash receipts journal, general ledger, general and subsidiary ledgers, payroll records and sales tax records (Govt.Ex. 3, categories 1 and 2; Govt.Exs. 1 and 2, categories 1–6).

**7.** Forms 941 with Schedule A, Forms W–2 or 1099 issued to employees, and statements of interest earned (Govt.Ex. 3, category 3; Govt.Ex. 2, category 12).

**8.** Accounting workpapers, computer input sheets, summaries of deposits and withdrawals on bank accounts, summaries of interest earned or paid, and summaries of sales for services provided (Govt.Exs. 1 and 2, categories 7 and 8; Govt.Ex. 2, categories 9–11).

**9.** It would seem the third class of documents considered in *Fisher*—reports and correspondence from the accountant to the taxpayer—may well have included materials prepared by the accountant for the taxpayer's own use.

evidencing his control over the documents, might provide sufficient circumstantial evidence of their authenticity. *See* 8 Wigmore *Evidence* § 2160, at 632 (McNaughton rev. 1961). But authenticity could just as readily have been inferred from the act of producing the documents in *Fisher,* and there the Court held otherwise under its "foregone conclusion" analysis (see Conclusion 6). *Fisher* cast considerable doubt on the constitutional significance of implicit authentication in cases involving records prepared by third parties (where the documents' genuineness can be independently and more easily established through testimony by these third parties).

8. *Fisher* does not however resolve the remaining issue posed by type (a) documents: to what extent (if any) Beligratis as sole proprietor can be compelled to produce his own records. *Fisher* specifically reserved judgment (425 U.S. at 414, 96 S.Ct. at 1582–83) on the propriety of compelling an individual to produce "his own tax records in his possession," for the documents it dealt with were not the taxpayer's "private papers" within the meaning of *Boyd v. United States,* 116 U.S. 616, 634–35, 6 S.Ct. 524, 534, 29 L.Ed. 746 (1886). This Court must now wrestle, as have several Courts of Appeals (not our own),[10] with how much of *Boyd*'s Fifth Amendment analysis as to personal records has survived *Fisher* and *Andresen v. Maryland,* 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), decided the same Term.

9. Certainly *Fisher* and *Andresen* might arguably be viewed as having extinguished any privacy rationale by which *Boyd* would *always* shelter any papers prepared by the accused person himself and remaining in his possession.[11] *Fisher* emphasized the Fifth Amendment does not bar compelled disclosure of private information unless self-incriminating testimony would be involuntarily elicited. 425 U.S. at 399–401, 96 S.Ct. at 1575–76. And *Andresen,* which focused solely on the existence of coerced testimonial communication, found no Fifth Amendment bar to a seizure of private business records. 427 U.S. at 470–77, 96 S.Ct. at 2743–46.

10. But only one Court of Appeals (that for the First Circuit) has drawn from *Fisher* and *Andresen* a rule permitting the government to subpoena from an individual his personal business records (let alone his private records), coupling such documentary production with an exclusionary rule to prevent government use in any way of the fact the individual had complied with the subpoena. *In re Grand Jury Proceedings,* 626 F.2d at 1057–58. All the other Circuits (see n. 10) have continued to adhere to the language of *Boyd*—though not always with a full exegesis of the *Fisher* text and of why *Boyd* should still be considered viable post-*Fisher* and post-*Andresen.*

11. Despite the ingenuity of the First Circuit approach (which should be read to be appreciated), this Court concludes a principled distinction can be made under the *Fisher* analysis that will protect the type (a) documents of a sole proprietor (and a fortiori, the documents of the same person in his individual rather than business capacity). Surely the prospect of implicit authentication looms greater where Beligratis himself has prepared a document he is forced to produce. And the implicit concession of genuineness involved in production also implicates a confirmation of the document's accuracy (which may bear on the mens rea

---

**10.** See such cases as, in the First Circuit, *In re Grand Jury Proceedings,* 626 F.2d 1051 (1st Cir.1980), followed in *United States v. Doe,* 628 F.2d 694 (1st Cir.1980); in the Second Circuit, *United States v. Beattie,* 541 F.2d 329 (2d Cir. 1976) (on post-*Fisher* remand of prior decision, 522 F.2d 267 (2d Cir.1975)), followed in *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981,* 657 F.2d 5, 6, 8 n. 1 (2d Cir. 1981); in the Third Circuit, *In re Grand Jury Proceedings,* 632 F.2d 1033, 1042–44 (3d Cir. 1980), *ICC v. Gould,* 629 F.2d 847, 858–59 (3d Cir.1980) and *In re Grand Jury Empanelled Feb. 14, 1978,* 597 F.2d 851, 859–61 (3d Cir. 1979); in the Fifth Circuit, *In re Grand Jury Subpoena,* 646 F.2d 963, 968–69 (5th Cir.1981) and *United States v. Davis,* 636 F.2d 1028, 1040–43 (5th Cir.1981); and in the Eighth Circuit, *United States v. Plesons,* 560 F.2d 890, 892–93 (8th Cir.1977).

**11.** *But see Davis* (cited n. 10), 636 F.2d at 1042.

requirement of the tax evasion offense). Tracking the *Fisher* discussion (425 U.S. at 409–13, 96 S.Ct. at 1580–82) with the contrasting facts of this case justifies the conclusion *Fisher* does not require the disavowal of prior law in this area.

12. Accordingly it is not unduly simplistic to advert to and follow the principle as stated two years before *Fisher* in *Bellis v. United States,* 417 U.S. 85, 87–88, 94 S.Ct. 2179, 2182–83, 40 L.Ed.2d 678 (1974):

> It has long been established, of course, that the Fifth Amendment privilege against compulsory self-incrimination protects an individual from compelled production of his personal papers and effects as well as compelled oral testimony. In *Boyd v. United States,* 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746] (1886), we held that "any forcible and compulsory extortion of a man's own testimony or of his private papers to be used as evidence to convict him of crime" would violate the Fifth Amendment privilege. *Id.,* at 630 [6 S.Ct. at 532]; see also *id.,* at 633–635 [6 S.Ct. at 533–36]; *Wilson v. United States,* 221 U.S. 361, 377 [31 S.Ct. 538, 55 L.Ed. 771] (1911). The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life. *Boyd v. United States, supra; Couch v. United States,* 409 U.S. 322 [93 S.Ct. 611, 34 L.Ed.2d 548] (1973); *Hill v. Philpott,* 445 F.2d 144 (CA7), cert. denied, 404 U.S. 991 [92 S.Ct. 533, 30 L.Ed.2d 542] (1971); *Stuart v. United States,* 416 F.2d 459, 462 (CA5 1969). As the Court explained in *United States v. White, supra,* [322 U.S. 694] at 698, [64 S.Ct. 1248 at 1251, 88 L.Ed. 1542] "[t]he constitutional privilege against self-incrimination ... is designed to prevent the use of legal process to force from the lips of the accused individual the evidence necessary to convict him or to force him to produce and authenticate any personal documents or effects that might incriminate him." See also *Curcio v. United States,* 354 U.S. 118, 125 [77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225]

(1957); *Couch v. United States, supra,* [409 U.S.] at 330–331 [93 S.Ct. at 616–17].

\* \* \* \* \* \*

For the reasons stated in the Findings and Conclusions, Petitioners' amended petition to enforce the three summonses involved in these actions is granted in its entirety, except with respect to such documents as Beligratis promptly and appropriately identifies (1) as having been prepared by him for his own use and (2) as self-incriminatory in Fifth Amendment terms. Respondents' motion to dismiss the amended petition is denied, subject only to the same exception. This action is set for a status hearing December 13, 1982 at 9 a.m. to establish the procedure for Respondents' compliance.

### Supplement

After the foregoing Findings and Conclusions were already prepared the parties provided this Court with a brief stipulation as to added facts (without prejudice to the right of either to object to relevance and materiality). That was almost immediately followed by Petitioners' Supplemental Memorandum relating to the stipulation and also calling the Court's attention to Judge Sofaer's very recent opinion in *United States v. Fox,* No. M–18–304 (ADS) (S.D. N.Y. Nov. 4, 1982).

This Court has reviewed Judge Sofaer's thoughtful opinion with care. That opinion reflects the same considered evaluation of the issues as the same judge's opinion in *In re Grand Jury Subpoena Duces Tecum Dated April 23, 1981,* 522 F.Supp. 977 (S.D.N.Y. 1981), on remand from the Second Circuit's 1981 opinion at 657 F.2d 5. Judge Sofaer's *Fox* opinion holds out the attractive prospect of distinguishing for Fifth Amendment purposes between Beligratis' *personal* papers and his *business* papers—a distinction that commends itself to this Court as reasonable. Indeed, this Court's initial analysis of the present case pointed to the desirability of constructing just such a distinction if it could be justified under the authorities.

But with all respect, the critical analytic step in that approach, as stated in Judge

Sofaer's slip opinion, appears a non sequitur:

> The suggestion that production of a document amounts to testimony as to its contents is confined to the area of purely personal and essentially non business documents.

Production of "private papers" (the *Boyd* terminology) prepared by an individual would seem to publish their contents—that is, would seem to be testimonial—whether they are love letters or letters to the sole proprietor's customers or suppliers. After all, it must be remembered, *Boyd* itself was a case against E.A. Boyd & Sons dealing with the proposed forfeiture (for customs fraud) of glass the Boyds had imported from Liverpool. 116 U.S. at 617–19, 6 S.Ct. at 525–26. If *Boyd* is alive and well as to an individual's "private papers," it is difficult to support a reasoned distinction grounded in authority that would protect "personal" "private papers" without also protecting "business" "private papers."

Accordingly this Court originally concluded (see Conclusions 11 and 12) that, at least absent some strong signal from its Court of Appeals or the Supreme Court, it was not for a District Court to create such a dichotomy (as rational as it might seem) in the first instance. *Fox* does not change that conclusion. This Court therefore adheres to its original position and to the Findings and Conclusions in their present form.

Finally, for the first time Petitioners' Supplemental Memorandum has suggested application of the "required records" doctrine to this case. Respondents have not had the opportunity to deal with that question. It would be most appropriate for both parties to do so later, in the context of Beligratis' identification of the self-prepared and self-incriminatory documents in accordance with the last paragraph of the foregoing opinion. At that time both the scope of the problem and the nature of the documents in issue will be better known. It may be (though speculation is obviously premature) that the "required records" doctrine, if in fact applicable, would generate a difference in treatment akin to a business records v. personal records distinction.

## ON MOTION FOR RECONSIDERATION

This Court's December 3, 1982 order (the "Order"), based on its contemporaneously entered Findings of Fact ("Findings") and Conclusions of Law ("Conclusions"), granted enforcement of three Internal Revenue Service ("IRS") summonses in principal part. One summons had been issued to Nickolaus Beligratis ("Beligratis") and the other two to his attorney, Helen Viney Porter ("Porter"). Enforcement was granted as to all but the first of four categories into which the documents called for by the summonses may be divided (this opinion will not again list the specific types of documents coming within each category):

   (a) documents prepared by Beligratis for his own use;

   (b) documents prepared by someone other than Beligratis for Beligratis' use;

   (c) retained copies of documents prepared by someone other than Beligratis to be filed with the government; and

   (d) documents prepared by someone other than Beligratis for the preparer's use.

Beligratis and Porter (collectively "Respondents") now move for reconsideration of the Order's refusal to extend Fifth Amendment protection to type (b) and (c) documents. For the reasons stated in this memorandum opinion and order, their motion is denied.

Respondents contend the Order's reliance on *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) is incompatible with some pronouncements made by the Supreme Court more than 70 years ago in *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911). Under their reading of *Wilson* the self-incrimination privilege shields a taxpayer from compulsory production of documents authored by third parties if those materials (1) are of the type customarily kept by taxpayers and (2) are held in a personal capacity. Both conditions, Respondents assert, are present here.

Their argument is unpersuasive for two reasons. First, *Fisher* itself undermines

their interpretation of *Wilson,* for both their asserted prerequisites for Fifth Amendment immunity were satisfied (or not satisfied!) there to the same extent and in the same way as here.[1] Second and more fundamentally, *Fisher*'s applicability to this case cannot be undercut by quoting from old Supreme Court precedent. *Fisher* marks the Court's most recent effort in its extended search for a unified theory of Fifth Amendment protection. As the Court put it, 425 U.S. at 409, 96 S.Ct. at 1580:

> In consequence, the prohibition against forcing the production of private papers has long been a rule searching for a rationale consistent with the proscriptions of the Fifth Amendment against compelling a person to give "testimony" that incriminates him.

*Fisher* thus necessarily represents the most authoritative exposition of the scope of the self-incrimination privilege. And as Conclusions 6 and 7 reflect, the Order's refusal to extend the Fifth Amendment's mantle to category (b) and (c) documents was *dictated* by *Fisher*'s specific holding and underlying rationale.[2]

### Conclusion

Respondents' motion for reconsideration is denied.

1. *Fisher* (which was really two cases) involved these kinds of documents:
   (1) accountant's work papers pertaining to a sole proprietor's (in that instance a doctor's) business books and records;
   (2) retained copies of the taxpayer's income tax returns;
   (3) the accountant's retained copies of reports and other correspondence between the accountant and the taxpayer; and
   (4) the accountant's analyses of taxpayers' income and expenses copied by the accountant from the taxpayers' cancelled checks and deposit receipts.
   No rational distinction exists between such documents and those at issue in this case. And in view of *Fisher*'s declaration that "the existence and location of the papers [in the taxpayer's possession] are a foregone conclusion" (425 U.S. at 411, 96 S.Ct. at 1581), Respondents' contrived notion that *Wilson* survives *Fisher* in the way they claim collapses entirely.

2. Though neither party referred to the decision, our Court of Appeals recently applied the im-

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's December 3, 1982 order (the "Order")[1] granted enforcement of three Internal Revenue Service ("IRS") summonses in principal part. One summons had been issued to Nickolaus Beligratis ("Beligratis") and the other two to his attorney, Helen Viney Porter ("Porter") (Beligratis and Porter are collectively "Respondents").

For analytical purposes the Order divided the documents called for by the summonses into four categories:

(a) documents prepared by Beligratis for his own use;[2]

(b) documents prepared by someone other than Beligratis for Beligratis' use;

(c) retained copies of documents prepared by someone other than Beligratis to be filed with the government; and

(d) documents prepared by someone other than Beligratis for the preparer's use.

Only the first of those four categories was found (Conclusions 8–12) exempt from compelled production under the "private papers" rationale of *Boyd v. United States,* 116 U.S. 616, 634–35, 6 S.Ct. 524, 534–35, 29 L.Ed. 746 (1886). This Court's December 30, 1982 memorandum opinion and order

plicit authentication concept adverted to in *Fisher* (425 U.S. at 409–14, 96 S.Ct. at 1580–82) and dealt with in the Order's Conclusion 6. *See United States v. Brown,* 688 F.2d 1112, 1116 & n. 1 (7th Cir.1982). In a puzzling footnote reference to *Fisher,* the Court of Appeals said (*id.* at n. 1):

> This case [*Fisher*] has nothing to do with authentication.

Of course *Brown* properly held (as *Fisher* specifically recognized) that the act of production itself can be implicit authentication of a document. Nothing in *Brown* affects the analysis in the Order.

1. In accordance with Fed.R.Civ.P. ("Rule") 52(a), the Order included and was based on Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").

2. Beligratis' cancelled checks, deposit slips and appointment books were listed as coming within this category (Conclusion 7 n. 5).

(the "Opinion") denied Respondents' motion for reconsideration, refusing to insulate any of the other documentary categories from the summonses.

At this Court's request Respondents (without waiving any rights) then provided additional information about documents of the types originally classified within category (a). It developed, for example, that a great many of the checks drawn on Beligratis' several accounts (and most likely many of the deposit slips) had been written by one of his employees, Glenda McUne, rather than by Beligratis himself. That fact triggered this Court's renewed examination of the authorities on which it had relied in the Order and Opinion (particularly *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976)). It also occasioned some independent research, focusing more sharply on the proper treatment of bank-account-related documents for Fifth Amendment purposes.

*Fisher* itself had not dealt specifically with such documents, but rather with papers coming within the other three categories described earlier (see Opinion at 713 n. 1). But this Court's own current look at the relevant authorities found that *United States v. Miller,* 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), decided the same day as *Fisher* and reported immediately following *Fisher,*[3] provided important teaching for the question now under consideration.

■ *Miller,* 425 U.S. at 441, 442, 96 S.Ct. at 1623, 1624 (1976) (quoting *Boyd,* 116 U.S. at 622, 6 S.Ct. at 527–28) held subpoenaing a bank's copies of cancelled checks and deposit slips (records the bank was statutorily required to maintain) was not "the functional equivalent of a search or seizure of the depositor's 'private papers'" because the depositor had no legitimate expectation of privacy in the *original* checks and deposit slips. Though *Miller* thus focused on the Fourth Amendment ramifications of *Boyd*'s "private papers" doctrine, its reasoning is equally pertinent to *Boyd*'s Fifth Amendment dimensions. As the word "private" suggests, *Boyd*'s "private papers" underpinning for the self-incrimination privilege does not extend to documents that fall outside the constitutionally protected zone of privacy.[4]

This Court's Order and Opinion have already dealt with the whittling away of *Boyd* by later authority. *Miller*'s rationale, rejecting any Fourth Amendment privacy interest that would bar compelled disclosure of cancelled checks and deposit slips, implicates the Fifth Amendment as well.[5] Whatever may survive of *Boyd*'s originally sweeping declaration, its remaining mantle cannot embrace such business records.

■ What this means is that *Miller* requires a fresh look at the content to be given to "documents prepared by the taxpayer for his own use"—the description used by the Order and Opinion for papers

**3.** Neither side's briefing had referred to *Miller.* This Court's attention was drawn to it by the serendipitous circumstance of some unrelated outside reading on the eve of the scheduled status call in this case.

**4.** Of course, as Conclusion 9 of the Order recognized, the Fifth Amendment does not immunize all private information from seizure. Instead, the private nature of the information sought is a necessary (but not a sufficient) condition for Fifth Amendment protection.

**5.** Though *Fisher* did not deal with cancelled checks (as the Order and Opinion reflected, the documents involved there fell clearly within categories (b), (c) and (d) described by this Court), Justice Brennan's concurring opinion contained a dictum that would hold protected "[n]onbusiness economic records in the posses-

sion of an individual, such as cancelled checks...." (425 U.S. at 427, 96 S.Ct. at 1589). But it is doubtful whether even Justice Brennan's analysis would have shielded Beligratis' checks and deposit slips, for his *Fisher* concurrence went on (*id.*):

> They [cancelled checks] are, however, like business records and the papers involved in these cases, frequently, though not always, disclosed to other parties; and disclosure, in proper cases, may foreclose reliance upon the privilege.

And in terms of the controlling views of the Court majority, it should be noted that *Miller* was decided over the dissent of Justice Brennan, which read the privacy interests of the taxpayer far more broadly (425 U.S. 447–55, 96 S.Ct. at 1626–29).

sheltered by the Fifth Amendment from coerced disclosure. *Miller* teaches that cancelled checks and deposit slips, prepared by their very nature for transmittal to the bank and (in the case of the checks) to payees, do not fit that description.[6]

Accordingly, enforcement of the three summonses is granted as to Beligratis' cancelled checks and deposit slips. Of the documents sought by the summonses, only Beligratis' appointment books remain "documents prepared by Beligratis for his own use," insulated as category (a) documents by the reasoning of the Order and Opinion.

---

**6.** ⋅ This Court's brief review of the cases listed at Conclusion 8 n. 10 discloses two Fifth Circuit cases that treated all business records of a sole proprietorship—including deposit slips and cancelled checks—as "private papers" insulated by *Boyd. In re Grand Jury Subpoena,* 646 F.2d 963, 965, 968–70 (5th Cir.1981); *United States v. Davis,* 636 F.2d 1028, 1032 n. 2, 1040–43 (5th Cir.1981). But such an undiscriminating application of *Boyd* certainly does not undercut this Opinion's refusal to equate such checking records with "documents prepared by the taxpayer for his own use."